RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0028p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

IN RE: GREEKTOWN HOLDINGS, LLC,

*Debtor*.

───────────────────────────────

BUCHWALD CAPITAL ADVISORS, LLC, solely in its capacity as Litigation Trustee to the Greektown Litigation Trust,

*Plaintiff-Appellant*,

*v*.

SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS; KEWADIN CASINOS GAMING AUTHORITY,

*Defendants-Appellees*.

Nos. 18-1165/1166

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit;
No. 2:14-cv-14103—Paul D. Borman, District Judge.

United States Bankruptcy Court for the Eastern District of Michigan at Detroit;
Nos. 08-bk-53104; 10-ap-05712—Maria L. Oxholm, Judge.

Argued:  October 17, 2018

Decided and Filed:  February 26, 2019

Before:  CLAY and GRIFFIN, Circuit Judges; ZOUHARY, District Judge.[*]

───────────────

## COUNSEL

**ARGUED:**  Gregory G. Rapawy, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Appellant.  Grant S. Cowan, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellees.  **ON BRIEF:**  Gregory G. Rapawy, Michael K. Kellogg,

───────────────────────

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

Katherine C. Cooper, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., Joel D. Applebaum, CLARK HILL PLC, Birmingham, Michigan, for Appellant.  Grant S. Cowan, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellees.

CLAY, J., delivered the opinion of the court in which GRIFFIN, J., joined.  ZOUHARY, D.J. (pp. 22–27), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

CLAY, Circuit Judge.  Plaintiff Buchwald Capital Advisors, LLC, in its capacity as litigation trustee for the Greektown Litigation Trust, appeals the district court's January 23, 2018 order affirming the bankruptcy court's dismissal of Plaintiff's complaint on the basis of tribal sovereign immunity.  Plaintiff's complaint seeks avoidance and recovery of allegedly fraudulent transfers made to Defendants Sault Ste. Marie Tribe of Chippewa Indians and Kewadin Casinos Gaming Authority pursuant to the Bankruptcy Code of 1978, 11 U.S.C. §§ 544, 550.  For the reasons set forth below, we **AFFIRM** the district court's dismissal.

**BACKGROUND**

**Factual Background**

This case arises out of the bankruptcy of Detroit's Greektown Casino (the "Casino") and several related corporate entities (collectively, the "Debtors").  Under the ownership and management of Defendant Sault Ste. Marie Tribe of Chippewa Indians and its political subdivision Defendant Kewadin Casinos Gaming Authority (collectively, the "Tribe"), the Casino opened in November 2000 and filed for bankruptcy in May 2008.

From the outset, the Tribe was under serious financial strain due to two obligations incurred in connection with the Casino.  In 2000, the Tribe entered into an agreement with Monroe Partners, LLC ("Monroe") to pay $265 million in exchange for Monroe's 50% ownership interest in the Casino, giving the Tribe a 100% ownership interest in the Casino.  And in 2002, the Tribe entered into an agreement with the City of Detroit to pay an estimated

$200 million to build a hotel and other facilities at the Casino in exchange for a continued gaming license from the Michigan Gaming Control Board ("MGCB").

In 2005, the Tribe restructured the Casino's ownership to alleviate this strain. The Tribe created a new entity, Greektown Holdings, LLC ("Holdings"), which became the owner of the Casino, while several pre-existing entities—all owned by the Tribe—became the owners of Holdings. This allowed the Tribe to refinance its existing debt, and allowed the intermediate entities to take on new debt, all to raise capital so that the Tribe could meet its financial obligations. Holdings, for example, took on $375 million of debt in various forms shortly after the restructuring.

The restructuring was subject to, and received, the approval of the MGCB. However, the MGCB conditioned its approval on the Tribe's adherence to strict financial covenants and other conditions. If those covenants and conditions were not satisfied, the MGCB could force the Tribe to sell its ownership interest in the Casino, or place the Casino into conservatorship.

On December 2, 2005, Holdings transferred approximately $177 million to several different entities. At least $145.5 million went to the original owners of Monroe—Dimitrios and Viola Papas, and Ted and Maria Gatzaros. At least $9.5 million went to other entities for the benefit of Dimitrios and Viola Papas, and Ted and Maria Gatzaros. And at least $6 million went to the Tribe.

Over the next three years, the Tribe attempted to raise additional capital to fully meet its financial obligations. However, by April 2008, the strain of these obligations had proved too much to bear, and the Tribe was in danger of losing both its ownership interest in the Casino—through failure to comply with the MGCB's restructuring conditions—and the Casino's gaming license—through failure to comply with the City of Detroit's development requirements. Accordingly, on May 29, 2008, the Debtors, including Holdings, the Casino, and other related corporate entities, filed voluntary petitions for Chapter 11 bankruptcy.[1]

---

[1]Both the bankruptcy and district courts assumed, for the purposes of considering the Tribe's motion to dismiss the Trustee's complaint on the basis of tribal sovereign immunity, that the Tribe exerted complete dominion

Under the Debtors' plan of reorganization, the Greektown Litigation Trust (the "Trust") was created to pursue claims belonging to the Debtors' estate for the benefit of unsecured creditors. Plaintiff Buchwald Capital Advisors, LLC (the "Trustee") was appointed as the Trust's litigation trustee, and in that capacity, the Trustee brought the instant case.

**Procedural History**

On May 28, 2010, the Trustee filed a complaint in the United States Bankruptcy Court for the Eastern District of Michigan. The Trustee's complaint alleges that, on December 2, 2005, Holdings fraudulently transferred $177 million to or for the benefit of the Tribe, and seeks avoidance and recovery of that amount pursuant to the Bankruptcy Code of 1978, 11 U.S.C. §§ 544, 550. The Tribe then filed a motion to dismiss the complaint on the grounds that the Tribe possessed tribal sovereign immunity from the Trustee's claims. The Trustee responded that that the Tribe did not possess tribal sovereignty (1) because Congress abrogated tribal sovereign immunity in the Bankruptcy Code of 1978, 11 U.S.C. §§ 106, 101(27), and (2) because the Tribe waived tribal sovereign immunity by actually or effectively filing the Debtors' bankruptcy petitions.[2] By stipulation of the parties, the bankruptcy court bifurcated the Tribe's motion—it would first decide whether Congress had abrogated the Tribe's immunity and then, if necessary, whether the Tribe had waived its immunity.

Regarding abrogation, the bankruptcy court denied the Tribe's motion to dismiss, holding that Congress had expressed its "clear, unequivocal, and unambiguous intent to abrogate tribal sovereign immunity" in 11 U.S.C. §§ 106, 101(27). (RE 1, Bankruptcy Court Opinion, No. 14-cv-14103, PageID # 43.) The Tribe appealed to the district court, which reversed, holding that Congress had not "clearly, unequivocally, unmistakably, and without ambiguity abrogate[d] tribal sovereign immunity" in 11 U.S.C. §§ 106, 101(27). (RE 5, District Court Opinion, PageID

---

and control over the Debtors such that the Tribe actually or effectively filed the Debtors' bankruptcy petitions. We do so as well.

[2]The Tribe's governing Tribal Code waives tribal sovereign immunity only "in accordance with [Code Sections] 44.105 or 44.108." (RE 5, Tribal Code, PageID # 307.) Section 44.105 requires a "resolution of the Board of Directors expressly waiving the sovereign immunity of the Tribe" with respect to specific claims. (*Id.*) And Section 44.108, at the relevant time, waived sovereign immunity with respect to all claims arising from written contracts that involve "a proprietary function" of the Tribe. (*Id.* at PageID # 308–10.) Except as otherwise indicated, record citations refer to the record in district court action No. 16-cv-13643.

# 203.)  The district court accordingly remanded the case to the bankruptcy court to decide whether the Tribe had waived its immunity.

Regarding waiver, and in light of the district court's holding on abrogation, the bankruptcy court granted the Tribe's motion to dismiss, holding (1) that the Tribe's litigation conduct "was insufficient to waive [tribal] sovereign immunity" since tribal law required an express board resolution, (2) that waiver of tribal sovereign immunity could not be "implied" through the litigation conduct of a tribe's alter ego or agent, and (3) that even if both of the above were possible, filing a bankruptcy petition does not waive tribal sovereign immunity "as to an adversary proceeding subsequently filed" against the tribe.  (*Id.*, Bankruptcy Court Opinion, at PageID # 449, 464, 456.)  The Trustee appealed to the district court which affirmed, similarly holding that no waiver of the Tribe's sovereign immunity could occur "in the absence of a board resolution expressly waiving immunity," and that the Trustee's "novel theory of implied waiver" through the "imputed" conduct of an alter ego or agent was foreclosed by binding precedent. (*Id.*, District Court Opinion, at PageID # 730, 744, 737.)

This appeal, regarding both abrogation and waiver, followed.

## DISCUSSION

### I.  Standard of Review

On appeal from a district court's review of a bankruptcy court's order, we review the bankruptcy court's order directly rather than the intermediate decision of the district court.  *In re McKenzie*, 716 F.3d 404, 411 (6th Cir. 2013).  We review questions of subject matter jurisdiction, including sovereign immunity, *de novo. DRFP, LLC v. Republica Bolivariana de Venezuela*, 622 F.3d 513, 515 (6th Cir. 2010).

### II.  Analysis

#### A.  Abrogation of Tribal Sovereign Immunity

Indian tribes have long been recognized as "separate sovereigns pre-existing the Constitution."  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).  As such, they possess the "common-law

immunity from suit traditionally enjoyed by sovereign powers." *Id.* (quoting *Santa Clara Pueblo*, 436 U.S. at 58). Yet this immunity is not without limit. Because Indian tribes are subject to Congress' plenary authority, Congress can abrogate tribal sovereign immunity "as and to the extent it wishes." *Id.* at 803–04. To do so, Congress must "unequivocally" express that purpose. *Id.* at 790 (quoting *Santa Clara Pueblo*, 436 U.S. at 58). "The baseline position [however], [the Supreme Court] [has] often held, is tribal immunity . . . ." *Id.* Thus, Indian tribes possess this "core aspect[] of sovereignty" unless and until Congress "unequivocally" expresses a contrary intent. *Id.* at 788, 790.

At issue in this case is whether Congress unequivocally expressed such an intent in the Bankruptcy Code of 1978, 11 U.S.C. §§ 106, 101(27). Section 106 provides, in relevant part, that "[n]ot withstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a *governmental unit* to the extent set forth in this section with respect to . . . Sections . . . 544 . . . [and] 550 . . . of [the Bankruptcy Code]." (emphasis added). Section 101(27) then provides that:

> [t]he term 'governmental unit' means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or *other foreign or domestic government.*

(emphasis added). The Trustee asserts that, read together, these sections constitute an unequivocal expression of congressional intent to abrogate tribal sovereign immunity. The Tribe asserts that that they do not.

In resolving this dispute, a useful place to start is Congress' knowledge and practice regarding the abrogation of tribal sovereign immunity in 1978. As *Bay Mills* and *Santa Clara Pueblo* indicate, an unequivocal expression of congressional intent is as much the requirement today as it was then. In fact, the Supreme Court decided *Santa Clara Pueblo* just six months before Congress enacted the Bankruptcy Code. Given this timing—and the fact that the Court in *Santa Clara Pueblo* simply reaffirmed a requirement already in existence, *see United States v. King*, 395 U.S. 1, 4 (1969)—the normal assumption that Congress was aware of this requirement

when enacting the Bankruptcy Code is well-grounded. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent.").

We also need not hypothesize whether Congress understood the meaning of "unequivocal," as Congress kindly demonstrated as much in the years immediately preceding its enactment of the Bankruptcy Code. *See, e.g.*, Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6972(a)(1)(A), 6903(13), 6903(15) (authorizing suits against an "Indian tribe"); Safe Water Drinking Act of 1974, 42 U.S.C. §§ 300j-9(i)(2)(A), 300f(10), 300f(12) (authorizing suits against an "Indian tribe").[3] The language used by Congress in these statutes accords with the Supreme Court's clear admonition that "[t]he term 'unequivocal,' taken by itself," means "admits no doubt." *Addington v. Texas*, 441 U.S. 418, 432 (1979) (citing Webster's Third New International Dictionary (1961)). Taken in the context of tribal sovereign immunity—where an "eminently sound and vital canon" dictates that any doubt is to be resolved in favor of Indian tribes, *Bryan v. Itasca Cty., Minn.*, 426 U.S. 373, 392 (1976)—that definition must be read literally. In order to abrogate tribal sovereign immunity, Congress must leave *no doubt* about its intent.

Ostensibly evidence enough that Congress *has* left doubt about its intent in 11 U.S.C. §§ 106 101(27), this issue "has been analyzed by a handful of courts, leading to two irreconcilable conclusions." *In re Greektown Holdings, LLC*, 532 B.R. 680, 686–87 (Bankr. E.D. Mich. 2015). On one side, the Ninth Circuit held in *Krystal Energy Co. v. Navajo Nation* that Congress *did* unequivocally express an intent to abrogate tribal sovereign immunity in

---

[3]At times, Congress also unequivocally—though unnecessarily—expressed its *lack* of intent to abrogate tribal sovereign immunity. *See, e.g.*, Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 5332 ("Nothing in this chapter shall be construed as . . . impairing the sovereign immunity from suit enjoyed by an Indian tribe . . . ."). We normally assume congressional awareness of such relevant statutory precedent as well. *See Goodyear Atomic Corp.*, 486 U.S. 174, 184–85 (1988). Moreover, both of these practices also continued long after the enactment of the Bankruptcy Code. *See, e.g.*, Fair Debt Collection Procedures Act of 1990, 28 U.S.C. §§ 3104, 3250, 3002(7), 3002(10) (authorizing suits against an "Indian tribe"); USA PATRIOT Improvement and Reauthorization Act of 2005, 18 U.S.C. § 2346 ("Nothing in this chapter shall be deemed to abrogate or constitute a waiver of any sovereign immunity of . . . an Indian tribe . . . .").

11 U.S.C. §§ 106, 101(27).  *See* 357 F.3d 1055, 1061 (9th Cir. 2004).**4**  On the other, the Seventh Circuit held in *Meyers v. Oneida Tribe of Indians of Wisc.* that Congress *did not* unequivocally express such an intent in a statute with functionally equivalent language, and in doing so noted the applicability of its reasoning to 11 U.S.C. §§ 106, 101(27).  *See* 836 F.3d 818, 827 (7th Cir. 2016).**5**  Unsurprisingly, the arguments made by the Trustee and the Tribe here largely track the reasoning used in these cases.  Thus, we turn there next.

In *Krystal Energy*, the court began with the fact that Indian tribes fall within the plain meaning of the terms "domestic" and "government," and have been repeatedly referred to by the Supreme Court as "domestic dependent nations."  357 F.3d at 1057 (citation omitted).  The court reasoned that Indian tribes are accordingly "simply a specific member of the group of domestic governments[] the immunity of which Congress intended to abrogate" when it used the phrase "other foreign or domestic government" in 11 U.S.C. § 101(27).  *Id.* at 1058.  Analogizing to state sovereign immunity, the court pointed out that "Congress clearly does not have to list all of the specific states, beginning with Alabama and ending with Wyoming;" rather it can instead just abrogate the immunity of "all states."  *Id.* at 1059.  Thus, the court concluded that by using the phrase "other foreign or domestic government," Congress effected a "generic abrogation" of sovereign immunity that unequivocally encompassed tribal sovereign immunity, "like that of all individual domestic governments."  *Id.*

In support of its holding, the court in *Krystal Energy* also noted that it could find "no other statute in which Congress effected a generic abrogation of sovereign immunity and because of which a court was faced with the question of whether such generic abrogation in turn effected specific abrogation of the immunity of a member of the general class."  *Id.*  However, the

---

**4**Several bankruptcy courts, using similar reasoning, have agreed.  *See, e.g.*, *In re Platinum Oil Props., LLC*, 465 B.R. 621, 643 (Bankr. D.N.M. 2011); *In re Russell*, 293 B.R. 34, 44 (Bankr. D. Ariz. 2003); *In re Vianese*, 195 B.R. 572, 576 (Bankr. N.D.N.Y. 1995); *In re Sandmar Corp.*, 12 B.R. 910, 916 (Bankr. D.N.M. 1981).

**5**Several district courts, bankruptcy appellate panels, and bankruptcy courts, using similar reasoning, have agreed.  *See, e.g.*, *In re Whitaker*, 474 B.R. 687, 695 (B.A.P. 8th Cir. 2012); *In re Money Ctrs. of Am., Inc.*, No. 17-318-RGA, 2018 WL 1535464, at *3 (D. Del. Mar. 29, 2018); *In re Greektown Holdings, LLC*, 532 B.R. 680 (E.D. Mich. 2015); *In re Star Grp. Commc'ns, Inc.*, 568 B.R. 616 (Bankr. D.N.J. 2016); *In re Nat'l Cattle Cong.*, 247 B.R. 259, 267 (Bankr. N.D. Iowa 2000); *see also In re Mayes*, 294 B.R. 145, 148 n.10 (B.A.P. 10th Cir. 2003) (noting that 11 U.S.C. §§ 106 and 101(27) "probably" do not abrogate tribal sovereign immunity).

Seventh Circuit in *Meyers* could and did find such a statute—the Fair and Accurate Credit Transactions Act of 2003 ("FACTA"), 15 U.S.C. § 1601 *et seq*.

FACTA authorizes suits against "person[s]" who accept credit or debit cards and then print certain information about those cards on receipts given to the cardholders. *See* 15 U.S.C. §§ 1681c(g)(1), 1681n, 1681o. FACTA in turn defines "person" as "*any* individual, partnership, trust, estate, cooperative, association, *government*, or governmental subdivision or agency, or other entity." *Id.* § 1681a(b) (emphasis added). In *Meyers*, Meyers argued that the phrase "any . . . government" unequivocally encompassed Indian tribes. 836 F.3d at 826. And in support of that argument, Meyers pointed to the functionally equivalent language at issue in *Krystal Energy*—"other foreign or domestic government" in 11 U.S.C. § 101(27).[6] *Id.* The Seventh Circuit, however, was unconvinced. *Id.*

In *Meyers*, the court began with the unequivocal expression of congressional intent requirement, and the canon that all doubt is to be resolved in favor of Indian tribes. *Id.* at 824. The court then listed statutes enacted around the time of the Bankruptcy Code in which Congress had unequivocally expressed such intent by authorizing suits against "Indian tribe[s]." *Id.* Turning to Meyers' argument about the phrase "any . . . government," the court reasoned that "[p]erhaps if Congress were writing on a blank slate, this argument would have more teeth, but Congress has demonstrated that it knows full and well how to abrogate tribal immunity." *Id.* "Congress . . . knows how to unequivocally [express that intent]. It did not do so in FACTA." *Id.* at 827.

The court then addressed the Ninth Circuit's conflicting opinion in *Krystal Energy*. While not "weigh[ing] in" on the precise issue of 11 U.S.C. §§ 106, 101(27), the Seventh Circuit made clear the flaw it saw in the Ninth Circuit's reasoning:

> Meyers argues that the district court dismissed his claim based on its erroneous conclusion that Indian tribes are not governments. He then dedicates many pages to arguing that Indian tribes are indeed governments. Meyers misses the point.

---

[6]The language in FACTA is arguably *broader* than the language in 11 U.S.C. §§ 106, 101(27), as in FACTA the term "government" has no qualifying language preceding it. *See Republic Steel Corp. v. Costle*, 621 F.2d 797, 804 (6th Cir. 1980) ("The [statutory] exception was broadened by the elimination of [any] qualifying language.") (quotation omitted).

The district court did not dismiss his claim because it concluded that Indian tribes are not governments. It dismissed his claim because it could not find a clear, unequivocal statement in FACTA that Congress meant to abrogate the sovereign immunity of Indian [t]ribes. *Meyers has lost sight of the real question in this sovereign immunity case—whether an Indian tribe can claim immunity from suit. The answer to this question must be 'yes' unless Congress has told us in no uncertain terms that it is 'no[,]' [as] [a]ny ambiguity must be resolved in favor of immunity.* Of course Meyers wants us to focus on whether the Oneida Tribe is a government so that we might shoehorn it into FACTA's statement that defines liable parties to include 'any government.' But when it comes to [tribal] sovereign immunity, shoehorning is precisely what we cannot do. Congress' words must fit like a glove in their unequivocality.

*Id.* at 826–27 (emphasis added) (internal citations omitted).

As for the "the real question"—unequivocality—the court found that the district court's analysis "hit the nail on the head:"

It is one thing to say 'any government' means 'the United States.' That is an entirely natural reading of 'any government.' But it's another thing to say 'any government' means 'Indian Tribes,' Against the long-held tradition of tribal immunity . . . 'any government' is equivocal in this regard.

*Id.* at 826 (alteration in original) (quoting *Meyers v. Oneida Tribe of Indians of Wisc.*, No. 15-cv-445, 2015 WL 13186223, at *4 (E.D. Wisc. Sept. 4, 2015)). Thus the court concluded that FACTA did not abrogate tribal sovereign immunity. *Id.* at 827. Significantly, a different panel of the Ninth Circuit has since favorably cited *Meyers* for this very heart of its analysis. In a case about the abrogation of federal sovereign immunity in the Fair Credit Reporting Act, the court reasoned that "[t]he same logic in *Meyers* applies with respect to the United States. The 'real question' in this sovereign immunity appeal is not whether the United States is a government; it is whether Congress explicitly [abrogated] sovereign immunity." *Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 774 (9th Cir. 2018).

We find the Seventh Circuit's reasoning in *Meyers*—as applied to 11 U.S.C. §§ 106, 101(27)—persuasive. And though *Meyers* was decided after the district court's opinion in this case, the district court clearly would have found the reasoning persuasive as well. The district court correctly acknowledged that "[t]here cannot be reasonable debate that Indian tribes are both 'domestic' . . . and also that Indian tribes are fairly characterized as possessing attributes of

a 'government.'" *In re Greektown Holdings,* 532 B.R. at 692. But that is not the real question. The real question is whether Congress—when it employed the phrase "other foreign or domestic government"—unequivocally expressed an intent to abrogate tribal sovereign immunity. "For the Litigation Trustee, it is enough to have established that Indian tribes are both 'domestic' and 'governments'" to answer that question in the affirmative. *Id.* at 693. The district court however, could not say "that Congress combined those terms in a single phrase in § 101(27) to clearly, unequivocally, and unmistakably express its intent to include Indian tribes . . . ."[7] *Id.* at 697. We agree. Establishing that Indian tribes are domestic governments does *not* lead to the conclusion that Congress unequivocally meant to include them when it employed the phrase "other foreign or domestic government."[8] *Id.* at 693.

This reasoning is both intuitive and in accordance with a broader survey of the case law. Notably, "there is not one example in all of history where the Supreme Court has found that Congress intended to abrogate tribal sovereign immunity *without* expressly mentioning Indian tribes somewhere in the statute." *Meyers*, 836 F.3d at 824 (quoting *In re Greektown Holdings*, 532 B.R. at 680). And there is only one example at the circuit court level. *Id.* (referring to the Ninth Circuit's decision in *Krystal Energy*). In contrast, there are numerous examples of circuits courts finding that tribal sovereign immunity was abrogated where the statute specifically

---

[7]The district court also noted that acknowledging the real question in this case provides a persuasive response to the *Krystal Energy* court's analogy to state sovereign immunity. *Id.* at 697. ("The faulty premise in this reasoning [that 'other foreign or domestic government' can be read to unequivocally include Indian tribes the same way 'states' can be read to unequivocally include Arizona] is that it presumes the very fact in contention, i.e., that 'domestic government' is a phrase clearly understood beyond all rational debate to encompass an Indian tribe, just as the word 'state' is clearly understood beyond all rational debate to encompass Arizona and the other 49 states.").

[8]The dissent disagrees on this point, framing its analysis around the question, "Is an Indian tribe a domestic government?" Dis. Op. at 23. As this approach mirrors that taken by Meyers and by the court in *Krystal Energy*, we need not engage with it in great detail. However, to the extent that the dissent attempts to highlight the appeal of this approach by stating it as a "simple syllogism"—"Sovereign immunity is abrogated as to all governments. Indian tribes are governments. Hence sovereign immunity is abrogated as to Indian tribes." *Id.* at 24—we note that the court in *Meyers* could easily have done the same with FACTA by stating the following: All people are subject to suit. All governments are people. Indian tribes are governments. Hence Indian tribes are subject to suit. And to the extent that the dissent attempts to distinguish *Meyers* based on FACTA's use of language authorizing suit against Indian tribes as opposed to language abolishing Indian tribes' immunity, that is a distinction without difference. Congress can abrogate tribal sovereign immunity by "stat[ing] an intent *either* to abolish Indian tribes' immunity *or* to subject tribes to suit." *Fla. Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 131 (11th Cir. 1999) (emphasis added). But Congress must state that intent unequivocally. The dissent's reasoning does nothing to disguise the fact that it too has "lost sight of the real question in this sovereign immunity case." *Meyers*, 836 F.3d at 826–27.

referred to an "Indian tribe," and refusing to do so where it did not. *Compare, e.g.*, *Blue Legs v. U.S. Bureau of Indian Affairs*, 867 F.2d 1094, 1097 (8th Cir. 1989) (finding that tribal sovereign immunity was abrogated in the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6972(a)(1)(A), 6903(13), 6903(15)); *Osage Tribal Council v. U.S. Dep't of Labor*, 187 F.3d 1174, 1182 (10th Cir. 1999) (finding that tribal sovereign immunity was abrogated in Safe Water Drinking Act of 1974, 42 U.S.C. §§ 300j-9(i)(2)(A), 300f(10), 300f(12)), *with Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 357 (2d Cir. 2000) (finding that tribal sovereign immunity was not abrogated in the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*); *Fla. Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1131 (11th Cir. 1999) (finding that tribal sovereign immunity was not abrogated in the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 *et seq.*). Here, it is undisputed that no provision of the Bankruptcy Code mentions Indian tribes.[9]

While it is true that Congress need not use "magic words" to abrogate tribal sovereign immunity, it still must unequivocally express that purpose. *F.A.A. v. Cooper*, 566 U.S. 284, 290–91 (2012). The Trustee thus correctly states that "what matters is the clarity of intent, not the particular form of words." (Brief for Appellant at 32.) We need not—and do not—hold that specific reference to Indian tribes is in all instances required to abrogate tribal sovereign immunity;[10] rather we hold that 11 U.S.C. §§ 106, 101(27) lack the requisite clarity of intent to abrogate tribal sovereign immunity.

This analysis notwithstanding, the Trustee asserts three additional arguments that it contends dispel any doubt that Congress intended to abrogate the sovereign immunity of Indian tribes in 11 U.S.C. §§ 106, 101(27). None are persuasive.

---

[9]The dissent deems this case law "irrelevant to the task of statutory interpretation before us." Dis Op. at 26. To the contrary, the fact that the Trustee and the dissent ask this Court to reach a holding "that deviates from all relevant decisions by our sister circuits," save for one, and "that is inconsistent with the Supreme Court's most recent guidance on the point" is highly relevant. *Armalite, Inc. v. Lambert*, 544 F.3d 644, 648 (6th Cir. 2008).

[10]For instance, a court might find an unequivocal expression of congressional intent in a statute stating that "sovereign immunity is abrogated as to all parties who could otherwise claim sovereign immunity." *Krystal Energy*, 357 F.3d at 1058.

First, the Trustee asserts that Indian tribes must be "governmental units" because they avail themselves of other Bankruptcy Code provisions pertaining to "governmental units." (*See* Brief for Appellant at 27.) (describing how Indian tribes would have to be "governmental units" in order to be creditors or to file requests for payment of administrative expenses, which they regularly do). Yet, as the Tribe correctly responds, the Bankruptcy Code defines the entities covered by those provisions using the word "includes"—a term of enlargement. In contrast, 11 U.S.C. § 101(27) defines "governmental unit" using the word "means"—a term of limitation. *See United States v. Whiting*, 165 F.3d 631, 633 (8th Cir. 1999) ("When a statute uses the word 'includes' rather than 'means' in defining a term, it does not imply that items not listed fall outside the definition."). Thus it is not inconsistent for Indian tribes to be covered by those provisions noted by the Trustee but not covered by 11 U.S.C. § 101(27).

Second, and relatedly, the Trustee asserts that Indian tribes must be "governmental units" because the Bankruptcy Code provides governmental units with "special rights." (*See* Brief for Appellant at 30.) (describing how Congress would have shown less regard for the dignity of Indian tribes as sovereigns, compared to state, federal, and foreign governments, if they were not entitled to these special rights). Yet it could just as easily be said that Congress has shown *greater* respect for Indian tribes than for other sovereigns by *not* abrogating their immunity in the first place—and thus not necessitating the provision of any special rights. The immunities of various sovereigns also need not be, and in fact are not, co-extensive. *Bay Mills*, 572 U.S. at 800–01. Moreover, these first two arguments raised by the Trustee both overlook the important distinction between being subject to a statute and being able to be sued for violating it. *See Kiowa Tribe v. Mfg. Tech., Inc.*, 523 U.S. 751, 755 (1998). Only in the latter context is there an unequivocality requirement. Thus it would also not be inconsistent for Indian tribes to be considered "governmental units" for some provisions of the Bankruptcy Code but not for 11 U.S.C. § 106.

Lastly, the Trustee asserts that Indian tribes must be "governmental units" because the Tribe cannot supply an example of any other entity besides Indian tribes that the phrase "other foreign or domestic government" might have been intended to cover. Yet even if Indian tribes are the only sovereigns not specifically mentioned in 11 U.S.C. § 101(27), then "why not just

mention them by their specific name, as Congress has *always* done in the past?" *In re Greektown Holdings*, 532 B.R. at 697. Congress' failure to do so, after arguably mentioning every other sovereign by its specific name, likely constitutes "circumstances supporting [the] sensible inference" that Congress meant to exclude them, pursuant to the familiar *expressio unius* canon. *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002). Such an inference is certainly more sensible than the alternative inference that the Trustee's argument asks us to make—that Congress meant for Indian tribes to be the *only* sovereign covered by the phrase "other foreign or domestic government." Regardless, "this Court does not revise legislation . . . just because the text as written creates an apparent anomaly as to some subject it does not address." *Bay Mills*, 572 U.S. at 794.[11]

"Determining the limits on the sovereign immunity held by Indians is a grave question; the answer will affect all tribes, not just the one before us." *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1654 (2018). It is the graveness of this question that led to the requirement that Congress unequivocally express its intent in order to abrogate tribal sovereign immunity. And that requirement "reflects an enduring principle of Indian law: Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government." *Bay Mills*, 572 U.S. at 790. Thus, the Supreme Court has repeatedly reaffirmed the requirement, and warned lower courts against abrogating tribal sovereign immunity if there is any doubt about Congress' intent. *See id.* at 800 ("[I]t is fundamentally Congress' job, not ours, to determine whether or how to limit tribal immunity."); *Kiowa*, 523 U.S. at 759 ("The capacity of the Legislative Branch to address [this] issue by comprehensive legislation counsels some caution by us in this area."); *Santa Clara Pueblo*, 436 U.S. at 60 ("[A] proper respect both for tribal sovereignty and for the plenary authority of

---

[11]The dissent adds one, equally unpersuasive argument, asserting that Indian tribes must be "governmental units" because abrogation of tribal sovereign immunity aligns with the Bankruptcy Code's "purpose of establishing and enforcing a fair and equitable [asset] distribution procedure." Dis. Op. at 27. Yet an interest in fairness and equity is not unique to bankruptcy. For instance, in *Florida Paraplegic*, the court held that the Americans with Disabilities Act—the purpose of which was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities"—did not abrogate tribal sovereign immunity, and in doing so even acknowledged that this "may seem . . . patently unfair." 166 F.3d at 1128, 1135. Indeed, "immunity doctrines [of all kinds] inevitably carry with them the seeds of occasional inequities. . . . Nonetheless, the doctrine of tribal [sovereign] immunity reflects a societal decision that tribal autonomy predominates over other interests." *Wichita and Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 781 (D.C. Cir. 1986).

Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent."). We heed those warnings, and hold that Congress did not unequivocally express an intent to abrogate tribal sovereign immunity in 11 U.S.C. §§ 106, 101(27).

### B. Waiver

"Similarly [to the unequivocality requirement for congressional abrogation of tribal sovereign immunity], a tribe's waiver [of its sovereign immunity] must be 'clear.'" *C&L Enters., Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001) (quoting *Okla. Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991)). The Trustee's argument that the Tribe clearly waived any tribal sovereign immunity it possessed has three analytical steps: (1) Indian tribes can waive sovereign immunity by litigation conduct, (2) alter egos or agents of Indian tribes can waive tribal sovereign immunity by litigation conduct, and (3) filing a bankruptcy petition waives sovereign immunity as to separate, adversarial fraudulent transfer claims. If each step is a correct statement of the law, then, according to the Trustee, the Tribe may have waived its immunity from the Trustee's fraudulent transfer claim by actually or effectively filing the Debtors' bankruptcy petitions in federal court. We agree with the first step of the Trustee's analysis, but we disagree with the second and third steps. Tribal sovereign immunity can be waived by litigation conduct, but not by the litigation conduct of a tribe's alter ego or agent, and the litigation conduct of filing a bankruptcy petition does not waive tribal sovereign immunity as to a separate, adversarial fraudulent transfer claim. Accordingly, we hold that the Tribe did not waive its tribal sovereign immunity.

The first step of the Trustee's argument is that Indian tribes can waive sovereign immunity by litigation conduct. Both the bankruptcy and district courts disagreed, relying heavily on part of our decision in *Memphis Biofuels, LLC v. Chickasaw Nation Indus.*, 585 F.3d 917 (6th Cir. 2009). However, *Memphis Biofuels* does not foreclose this step.

In *Memphis Biofuels*, a contract between Memphis Biofuels and a corporation owned by the Chickasaw tribe included a provision by which both parties purported to waive all immunities from suit. *Id.* at 921–22. However, under the tribal corporation's charter, any waiver

of sovereign immunity required a resolution approved by the tribe's board of directors. *Id.* Such a resolution was never obtained, and the question arose whether the tribal corporation possessed sovereign immunity. *Id.* We ultimately held that despite the contract provision purporting to waive all immunities, the Chickasaw tribe possessed tribal sovereign immunity because the contractual waiver was an "unauthorized act[]" that was "insufficient to waive tribal-sovereign immunity." *Id.* at 922. Because "board approval was not obtained, [the] charter control[led]" the issue. *Id.*

This holding, combined with the fact that the Tribe's governing code has a similar board resolution requirement that was undisputedly not satisfied, was enough for the bankruptcy and district courts to find that the Tribe did not waive its sovereign immunity. However, *Memphis Biofuels* involved no litigation conduct on the part of the Chickasaw tribe, and neither this Court nor the parties cited any of the Supreme Court cases pertaining to waiver of sovereign immunity by litigation conduct. Accordingly, *Memphis Biofuels*, like all cases, "cannot be read as foreclosing an argument that [it] never dealt with." *Waters v. Churchill*, 511 U.S. 661, 678 (1994).

Thus we have yet to decide whether the doctrine of waiver of sovereign immunity by litigation conduct applies to Indian tribes. While the Supreme Court has long held that such waiver is possible for non-tribal sovereigns, *see, e.g.*, *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002); *Gardner v. New Jersey*, 329 U.S. 566, 573 (1947); *Gunter v. Atl. Coast Line RR. Co.*, 200 U.S. 273, 284 (1906), few courts have had the opportunity to extend the Supreme Court's holdings to Indian tribes. Those that have had the opportunity however, have largely chosen to do so, holding that certain types of litigation conduct by tribes constitute a sufficiently clear waiver of tribal sovereign immunity.

For example, two circuits have held that intervening in a lawsuit constitutes waiver. *See Hodel*, 788 F.2d at 773 ("By so intervening, a party 'renders itself vulnerable to complete adjudication by the federal court of the issues in litigation between the intervenor and the adverse party.'") (citation omitted); *United States v. Oregon*, 657 F.2d 1009, 1014 (9th Cir. 1981) ("By successfully intervening, a party makes himself vulnerable to complete adjudication by the federal court of the issues in litigation between the intervenor and the adverse party.").

Similarly, two circuits have considered the possibility that removal of an action from state to federal court might constitute waiver. *See Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1023–24 (9th Cir. 2016); *Contour Spa at the Hard Rock, Inc. v. Seminole Tribe of Fla.*, 692 F.3d 1200, 1207–08 (11th Cir. 2012). While ultimately holding that removal did not constitute sufficiently clear waiver, these cases serve as additional examples of circuits willing to accept that some litigation conduct *may* constitute sufficiently clear waiver.

More relevant to the facts of this case, three circuits have held that filing a lawsuit constitutes waiver. *See Bodi*, 832 F.3d at 1017 ("By filing a lawsuit, a tribe may of course 'consent to the court's jurisdiction to determine the claims brought' and thereby agree to be bound by the court's decision on those claims.") (citation omitted); *Rupp v. Omaha Indian Tribe*, 45 F.3d 1241, 1245 (8th Cir. 1995) ("[B]y initiating this lawsuit, the Tribe 'necessarily consents to the court's jurisdiction to determine the claims brought adversely to it.'") (citation omitted); *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1344 (10th Cir. 1982) ("It is recognized, however, that 'when the sovereign sues it waives [some of its sovereign immunity].' . . . This doctrine equally applies to Indian tribes.") (citation omitted).

Like intervention, and unlike removal, filing a lawsuit manifests a clear intent to waive tribal sovereign immunity with respect to the claims brought, and to assume the risk that the court will make an adverse determination on those claims. To hold otherwise would have significant implications. *See Rupp*, 45 F.3d at 1245 ("We will not transmogrify the doctrine of tribal sovereign immunity into one which dictates that the tribe never loses a lawsuit."); *Oregon*, 657 F.2d at 1014 ("Otherwise, tribal immunity might be transformed into a rule that tribes may never lose a lawsuit."). Thus, we hold that Indian tribes can waive their tribal sovereign immunity through sufficiently clear litigation conduct, including by filing a lawsuit.

The second step of the Trustee's argument is that alter egos or agents of Indian tribes can waive tribal sovereign immunity by litigation conduct. Both the bankruptcy and district courts disagreed, relying on a different part of our decision in *Memphis Biofuels*. *Memphis Biofuels* forecloses this step.

In *Memphis Biofuels*, we refused to apply "equitable doctrines" such as equitable estoppel and actual or apparent authority to attribute to the Indian tribe conduct that allegedly constituted waiver. 585 F.3d at 922. The alter ego doctrine is similarly equitable. *Trs. of Detroit Carpenters Fringe Benefit Fund v. Indus. Contracting, LLC*, 581 F.3d 313, 317–18 (6th Cir. 2009). Thus, we hold that the litigation conduct of alter egos or agents of Indian tribes cannot be attributed to the tribes for the purpose of waiving tribal sovereign immunity. Such imputation would require an impermissible implication. *See Santa Claro Pueblo*, 436 U.S. at 58 ("It is settled that a waiver of [tribal] sovereign immunity cannot be implied . . . .").

In urging this Court to hold the opposite, the Trustee relies on *First Nat'l Bank v. Banco El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) and a handful of circuit court cases applying alter-ego and agency doctrines to find that foreign governments and states waived their sovereign immunity. Notably, however, the Trustee cites to no case in which these doctrines were applied to Indian tribes, and we can find none. (*See* Brief for Appellee at 37.) ("The Trustee then takes a tortured path—unsupported by a single case from any court anywhere . . . ."); *Buchwald Capital Advisors, LLC v. Sault Ste. Marie Tribe of Chippewa Indians*, 584 B.R. 706, 719 (Bankr. E.D. Mich. 2018) ("No court has ever applied the equitable doctrine of alter-ego/veil piercing to find a waiver of an Indian tribe's sovereign immunity . . . .").

The Trustee's cases concerning foreign and state governments are also unpersuasive. While the Supreme Court has held that the law of foreign sovereign immunity is "[i]nstructive" in cases involving tribal sovereign immunity, *C&L Enters.*, 532 U.S. at 421 n.3, that is not the case where there is a clear conflict between the two. Significantly, the Foreign Sovereign Immunities Act ("FSIA") allows foreign governments to waive their sovereign immunity by implication. 28 U.S.C. § 1605(a)(1) ("A foreign state shall not be immune . . . in any case in which the foreign state has waived its immunity either explicitly or by implication."). In contrast, Indian tribes cannot waive their immunity by implication. *Santa Claro Pueblo*, 436 U.S. at 58 ("It is settled that a waiver of [tribal] sovereign immunity cannot be implied . . . ."); *Allen v. Gold Country Casino*, 464 F.3d 1044 1048 (9th Cir. 2006) ("There is simply no room to apply the FSIA by analogy. . . . [The FSIA] permits a waiver of immunity to be implied, while the Supreme Court permits no such implied waiver in the case of Indian tribes.").

Analogizing to state sovereign immunity is equally unhelpful. Though it carries a similar ban on waiver by implication, *Coll. Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999), it is "not congruent with" tribal sovereign immunity. *Three Affiliated Tribes of Fort Berthold v. Wold Eng'g*, 476 U.S. 877, 890 (1986); *see also Bodi*, 832 F.3d at 1020 ("Tribal immunity is not synonymous with a State's Eleventh Amendment immunity, and parallels between the two are of limited utility."). A good example of such incongruency is provided by a set of cases dealing precisely with waiver by litigation conduct— specifically, the removal of a case from state to federal court. *States* that remove cases against them waive their sovereign immunity, while *tribes* that remove cases against them likely do not. *Compare Lapides* 535 U.S. at 617, *with Bodi*, 832 F.3d at 1020; *Contour Spa*, 692 F.3d at 1206, 1208. Accordingly, we do not place great weight on those cases concerning the litigation conduct of alter egos or agents of foreign and state governments.

The third and final step of the Trustee's argument is that filing a bankruptcy petition waives tribal sovereign immunity as to separate, adversarial fraudulent transfer claims. As the analysis of the first step hinted, whether a waiver of sovereign immunity has occurred is an inquiry separate and distinct from a waiver's scope. For instance, filing a lawsuit constitutes waiver by litigation conduct, but that waiver is a limited one. It waives sovereign immunity as to the court's decision on the claims brought by the tribe, *see Bodi*, 832 F.3d at 1017, but not as to counterclaims brought against the tribe, even where compulsory. *Okla. Tax*, 498 U.S. at 509.**12**

The Trustee relies on *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356 (2006), in contending that filing a bankruptcy petition waives tribal sovereign immunity to separate, adversarial fraudulent transfer claims. However, while the Supreme Court did hold as much in *Katz*, its holding pertained only to *state* sovereign immunity, and does not merit extension. In addition to the limited utility of any parallels between the two doctrines as noted above, the Supreme Court in *Katz* based its holding primarily on the unique relationship between states, the Constitution,

---

**12**Those circuits that have held that filing a lawsuit constitutes a waiver of tribal sovereign immunity recognize an exception to the rule in *Okla. Tax* for counterclaims sounding in equitable recoupment—a defensive action to diminish a plaintiff's recovery as opposed to one asserting affirmative relief. *See, e.g.*, *Quinault Indian Nation v. Pearson*, 868 F.3d. 1093, 1099 (9th Cir. 2017); *Rosebud Sioux Tribe v. Val-U Constr. Co. of S.D.*, 50 F.3d 560, 562 (8th Cir. 1995); *Jicarilla Apache Tribe*, 687 F.2d at 1346. We need not decide whether to join these circuits as it is undisputed that the Trustee's fraudulent transfer claim does not sound in equitable recoupment.

and federal bankruptcy law. *See id.* at 362–63, 378 ("The history of the Bankruptcy Clause, the reasons it was inserted in the Constitution, and the legislation both proposed and enacted under its auspices immediately following ratification of the Constitution demonstrate that it was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena. . . . The ineluctable conclusion, then, is that States agreed in the plan of the Convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to [federal bankruptcy law]. . . . In ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted . . . .").

Because of this reasoning, courts have been reluctant to extend the holding in *Katz* from states to other sovereigns, and we choose not to do so here. *See, e.g.*, *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 253 n.6 (5th Cir. 2006) ("Regardless what effect *Katz* has with respect to some aspects of state or local governmental units' encounters with bankruptcy, *Katz* has no effect on this case involving federal sovereign immunity."). Extension to Indian tribes in particular would certainly not accord with the reasoning in *Katz*, given the tribes' obvious absence from the Constitutional Convention. *See Blatchford v. Native Village of Noatak*, 501 U.S. 775, 782 (1991) ("[I]t would be absurd to suggest that the tribes surrendered immunity in a convention to which they were not even parties."). Thus, we hold that the filing of a bankruptcy petition does not waive tribal sovereign immunity as to separate, adversarial fraudulent transfer claims, and ultimately that the Debtors' doing so did not waive the Tribe's tribal sovereign immunity as to the Trustee's fraudulent transfer claim.

## CONCLUSION

It is not lost on this Court that the Trustee may regard this result—dismissal of its complaint—as unfair. The Supreme Court has acknowledged that "[t]here are reasons to doubt the wisdom of perpetuating this doctrine" given that tribal sovereign immunity "can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter." *Kiowa*, 523 U.S. at 758. "[B]ut that is the reality of sovereign immunity." *Memphis Biofuels*, 585 F.3d at 922. As state above, "[i]mmunity doctrines [of all kinds] inevitably carry within them the seeds of occasional inequities. . . . Nonetheless, the

doctrine of tribal [sovereign] immunity reflects a societal decision that tribal autonomy predominates over other interests." *Hodel*, 788 F.2d at 781. Accordingly, we defer to Congress and the Supreme Court to exercise their judgment in this important area.

For the reasons set forth above, we **AFFIRM** the district court's dismissal.

---

**DISSENT**

---

ZOUHARY, District Judge, dissenting.

What we are looking for in the Bankruptcy Code is an "unequivocal expression of . . . legislative intent" to abrogate tribal sovereign immunity. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978). Such an expression need not be stated in "any particular way" nor use any "magic words." *FAA v. Cooper*, 566 U.S. 284, 291 (2012). The "proper focus" of this inquiry is on "the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 231 (1989). When we look for this unequivocal expression, we employ our "traditional tools of statutory construction." *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 589 (2008).

I

We begin with the text. Section 106(a) of the Code states that "sovereign immunity is abrogated as to a governmental unit." 11 U.S.C. § 106(a). Right off the bat, we have an explicit, unmistakable statement from Congress that it intends to abrogate sovereign immunity. The sole remaining question is whose sovereign immunity.

For the answer to that question, we turn to Section 101(27), which provides:

> The term "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; *or other foreign or domestic government*.

11 U.S.C. § 101(27) (emphasis added). In this definition, Congress chose to speak broadly. It chose to abrogate the sovereign immunity of all those governmental entities listed explicitly in Section 101(27), and, on top of those, any "other foreign or domestic government." In other words, Congress abrogated the sovereign immunity of any government, of any type, anywhere in the world. *See Krystal Energy Co. v. Navajo Nation*, 357 F.3d 1055, 1057 (9th Cir. 2004), *as*

*amended on denial of reh'g* (Apr. 6, 2004) ("[L]ogically, there is no other form of government outside the foreign/domestic dichotomy . . . .").

Because the statute contains clear language that "sovereign immunity is abrogated" and that language applies to domestic governments, the sole remaining question is one the majority ignores:  Is an Indian tribe a domestic government?  A tribe is certainly domestic, residing and exercising its sovereign authority within the territorial borders of the United States.  And a tribe is a form of government, exercising political authority on behalf of and over its members.

Supreme Court precedent supports this natural reading.  The Court refers to Indian tribes as "'domestic dependent nations' that exercise inherent sovereign authority over their members and territories."  *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) (quoting *Cherokee Nation v. Georgia,* 5 Pet. 1, 17, 8 L.Ed. 25 (1831)); *see also Blatchford v. Native Village of Noatak,* 501 U.S. 775, 782 (1991) (comparing Indian tribes to states and foreign sovereigns and concluding that both states and Indian tribes are "domestic" sovereigns).  The Court says that tribal sovereign immunity itself derives from "Indian sovereignty and self-governance."  *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 890 (1986).  Indeed, the Court explains the basis of tribal sovereign immunity by comparing Indian tribes to "other governments."  *Turner v. United States*, 248 U.S. 354, 357 (1919) ("Like other governments, municipal as well as state, the Creek Nation was free from liability . . . .").  This comparison to "other governments" makes sense only if tribes are themselves governments.

Congress, too, says Indian tribes are domestic governments, as numerous provisions of the United States Code demonstrate.  *See, e.g.*, 6 U.S.C. § 572(a) (directing cooperation with "State, local, and tribal governments"); 15 U.S.C. § 7451(a)(2) (authorizing various cybersecurity activities that include "State, local, and tribal governments"); 19 U.S.C. § 4332(d)(4)(A)(i) (requiring sharing of best practices concerning a safety plan with "State, local, and tribal governments"); 23 U.S.C. § 202(a)(1)(B)–(C) (providing for funding of certain programs and projects "administered by" or "associated with a tribal government"); 51 U.S.C. § 60302(2) (authorizing research and development "to enhance Federal, State, local, and tribal

governments' use of" certain technologies); *see also* 25 U.S.C. § 4116(b)(2)(B)(ii)(I) (referring to a "government-to-government relationship between the Indian tribes and the United States").

The clear textual evidence of congressional intent to abrogate tribal sovereign immunity in Sections 106(a) and 101(27) is stated as a simple syllogism: Sovereign immunity is abrogated as to all governments. Indian tribes are governments. Hence sovereign immunity is abrogated as to Indian tribes. *See In re Russell*, 293 B.R. 34, 40 (Bankr. D. Ariz. 2003) (explaining that logical deduction from express statutory language satisfies a standard of unequivocality). Taken together, the text of Sections 106(a) and 101(27) form a clear expression of legislative intent to abrogate the sovereign immunity of Indian tribes.

II

But if this expression is so clear, the majority asks, then how could two circuit courts come to seemingly opposite conclusions about it? *Compare Meyers v. Oneida Tribe of Indians of Wis.*, 836 F.3d 818, 826 (7th Cir. 2016), *with Krystal Energy*, 357 F.3d at 1061. This alleged circuit split is less of a conflict than the majority opinion suggests. The only appellate court to rule previously on this question—whether the Bankruptcy Code abrogates tribal sovereign immunity—is the Ninth Circuit in *Krystal Energy*. That court held the Code abrogates immunity. *Krystal Energy*, 357 F.3d at 1061.

The Seventh Circuit in *Meyers* was looking at different language in a different statute. In *Meyers*, the statute at issue was the Fair and Accurate Credit Transaction Act (FACTA). Meyers wanted to sue the Oneida Tribe because he made credit card purchases at tribe-run businesses, and those businesses produced receipts revealing his credit card number, in violation of FACTA. At issue was whether FACTA abrogated tribal sovereign immunity. The statute provides, "[N]o *person* that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g)(1) (emphasis added). It states that any "person" who violates the statute shall be subject to civil liability. 15 U.S.C. §§ 1681n, 1681o. FACTA defines a "person" as "any individual, partnership, corporation, trust,

estate, cooperative, association, *government* or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b) (emphasis added).

The Seventh Circuit held that this statutory language did not abrogate tribal sovereign immunity. It reasoned that the term "government," as it appears in FACTA, left ambiguity about whether that word alone was intended to abrogate tribal sovereign immunity. *Meyers*, 836 F.3d at 820. But nowhere in *Meyers* did the Seventh Circuit say that Indian tribes are not governments. Further, the Seventh Circuit explicitly steered clear of ruling on how the term "government," as it appears in the Bankruptcy Code, might apply to Indian tribes. *Id.* at 826 ("We need not weigh in on . . . how to interpret the breadth [of] the term 'other domestic governments' under the Bankruptcy Code . . . .").

The Seventh Circuit finding of ambiguity in FACTA does not affect our analysis of the Bankruptcy Code. Consider how different the FACTA text is from that of the Bankruptcy Code. The Bankruptcy Code states, in no mistakable terms, "sovereign immunity is abrogated as to a governmental unit." 11 U.S.C. § 106(a). FACTA, on the other hand, merely declares a rule that applies to "person[s]" and says that "person[s]" shall be liable for rule violations. *See* 15 U.S.C. §§ 1681c(g)(1), 1681n, 1681o. Where FACTA makes no mention of sovereign immunity, the Code targets it directly.

Next, consider the differences in the definition sections. The Bankruptcy Code defines "governmental units" using several specific terms and a broad, catch-all term at the end. 11 U.S.C. § 101(27). And all these terms have one common thread: they are entities that would otherwise be entitled to sovereign immunity. Contrast that with the FACTA definition of "person," which mostly lists entities that would not otherwise be entitled to sovereign immunity. *See* 15 U.S.C. § 1681a(b). These definitions are not "functionally equivalent." Majority Op. at 8–9. One gives far more evidence of intent to abrogate the sovereign immunity of any government of any type.

No wonder the Seventh Circuit could not say "with 'perfect confidence'" that Congress intended FACTA to abrogate tribal sovereign immunity. *Meyers*, 836 F.3d at 827 (quoting *Dellmuth*, 491 U.S. at 231). In contrast, the Bankruptcy Code has no such lack of textual

evidence.  This is why the only other circuit court to address this question concluded, "Because Indian tribes are domestic governments, Congress has abrogated their sovereign immunity." *Krystal Energy*, 357 F.3d at 1061.

Although *Meyers* and *Krystal Energy* can be reconciled based on these differences in statutory language, there is one point of reasoning upon which they—and I with the majority— fundamentally disagree.  *Meyers* and the majority seem to think it important that the Bankruptcy Code does not mention the words "Indian tribe" and that "there is not one example in all of history where the Supreme Court has found that Congress intended to abrogate tribal sovereign immunity *without* expressly mentioning Indian tribes somewhere in the statute."  *Meyers*, 836 F.3d at 824 (quoting *In re Greektown Holdings*, *LLC*, 532 B.R. 680, 693 (E.D. Mich. 2015)); *see also* Majority Op. at 11.  Such an observation highlights the lack of on-point precedent to guide our decision, but it is otherwise irrelevant to the task of statutory interpretation before us.

In the majority's focus on these "magic words," *Cooper*, 566 U.S. at 291, it ignores the differences in statutory language between the statutes analyzed in other cases and the one before us today.  The Circuit and Supreme Court opinions referenced by the majority analyzed statutes that featured neither the Bankruptcy Code's clear language that "sovereign immunity is abrogated" nor its all-encompassing, sovereign-focused definition of "governmental unit."  Our task is to determine whether "the language of the statute" contains an unequivocal expression of intent to abrogate sovereign immunity.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985).  Our task is not to hold Congress to a standard of speaking as precisely as it possibly can or to demand that it use the same words today as it has in the past.

Justice Scalia, providing the fifth vote in *Dellmuth*, emphasized this point, saying that "congressional elimination of sovereign immunity in statutory text" need not make "explicit reference" to any particular terms.  *Dellmuth*, 491 U.S. at 233 (Scalia, J., concurring).  So long as the language of the statute, in whatever form, clearly subjects the sovereign to suit, that will suffice to abrogate immunity.  *Id.*; *see also United States v. Beasley*, 12 F.3d 280, 284 (1st Cir. 1993) (Breyer, C.J.) ("Congress can embody a similar . . . intent in different ways in different statutes.").

As *Krystal Energy* held and as explained above, the Code's text forms a clear expression of legislative intent to abrogate the sovereign immunity of Indian tribes.

III

Where the text gives clear evidence of congressional intent to abrogate, courts may look to the larger statutory scheme to "dispel[]" any "conceivable doubt" of that intent. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 56–57 (1996); *see also Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). We next look to the Bankruptcy Code's purpose.

"[T]he object of bankruptcy laws is the equitable distribution of the debtor's assets amongst his creditors . . . ." *Kuehner v. Irving Tr. Co.*, 299 U.S. 445, 451 (1937). "Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally." S. Rep. No. 95-989, at 49 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5835; H.R. Rep. No. 95-595, at 340 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6297; *see also Begier v. I.R.S.*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code.").

The Code's purpose of establishing and enforcing a fair and equitable distribution procedure is consistent with the broad abrogation of Sections 106(a) and 101(27). With a broad abrogation of immunity, all governments must play by the rules. This context in no way contradicts the text's plain meaning—sovereign immunity is abrogated as to any government, including Indian tribes. Congress expressed its intention unequivocally.

For these reasons, I respectfully dissent.