# United States Court of Appeals

## For the First Circuit

No. 21-1153

IN RE: BRIAN W. COUGHLIN,

Debtor.

BRIAN W. COUGHLIN,

Appellant,

v.

LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; L.D.F.
BUSINESS DEVELOPMENT CORP.; L.D.F. HOLDINGS, LLC; NIIWIN, LLC,
d/b/a Lendgreen,

Appellees.

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Frank J. Bailey, U.S. Bankruptcy Judge]

Before

Barron, Chief Judge,
Lynch, Circuit Judge,
and Burroughs,[*] District Judge.

Gregory G. Rapawy, with whom Terrie L. Harman, Richard N.
Gottlieb, Michael D. Cameron, Kellogg, Hansen, Todd, Figel &
Frederick, P.L.L.C., Alfano Law Office, PLLC, and the Law Offices
of Richard N. Gottlieb were on brief, for appellant.
Andrew Adams, III, with whom Peter J. Rademacher, Zachary

---

[*] Of the District of Massachusetts, sitting by designation.

R.G. Fairlie, Andrew W. Lester, Adrienne K. Walker, Hogen Adams PLLC, Spencer Fane LLP, and Locke Lord LLP were on brief, for appellees.

Seth Davis, Kaighn Smith, Jr., Amy K. Olfene, and Drummond Woodsum on brief for amici curiae professors of federal Indian law in support of appellees.

Patrick O. Daugherty, Laura E. Jones, and Van Ness Feldman LLP on brief for amicus curiae Native American Financial Services Ass'n in support of appellees.

————————————

May 6, 2022

————————————

**LYNCH**, **Circuit Judge**. This case presents an important question of first impression in our circuit: whether the Bankruptcy Code abrogates tribal sovereign immunity. Two of our sister circuits have already considered the question and reached opposite conclusions. Compare Krystal Energy Co. v. Navajo Nation, 357 F.3d 1055, 1061 (9th Cir. 2004) (holding that the Code abrogates immunity), with In re Greektown Holdings, LLC 917 F.3d 451, 460-61 (6th Cir. 2019) (holding that the Code does not abrogate immunity), cert. dismissed sub nom. Buchwald Cap. Advisors LLC v. Sault Ste. Marie Tribe, 140 S. Ct. 2638 (2020). Like the Ninth Circuit, we hold that the Bankruptcy Code unequivocally strips tribes of their immunity.

Our decision permits debtor Brian W. Coughlin to enforce the Bankruptcy Code's automatic stay against one of his creditors, a subsidiary of the Lac Du Flambeau Band of Lake Superior Chippewa Indians ("Band"). As the bankruptcy court held otherwise, see In re Coughlin, 622 B.R. 491, 494 (Bankr. D. Mass. 2020), we reverse.

**I.**

In July 2019, Coughlin took out a $1,100 payday loan from Lendgreen, a wholly owned subsidiary of the Band.[1] Later that

---

[1] Lendgreen is a trade name of Niiwan, LLC. The Band is the sole owner of the L.D.F. Business Development Corporation. That entity is the sole member of LDF Holdings, LLC, which in turn is the sole member of Niiwan. All parties agree that Lendgreen is an arm of the Band, so it enjoys whatever immunity the Band does.

year, he voluntarily filed a Chapter 13 bankruptcy petition in the District of Massachusetts. On the petition, he listed his debt to Lendgreen, which had grown to nearly $1,600, as a nonpriority unsecured claim. He also listed Lendgreen on the petition's creditor matrix, and his attorney mailed Lendgreen a copy of the proposed Chapter 13 plan.

When Coughlin filed his petition, the Bankruptcy Code imposed an automatic stay enjoining "debt-collection efforts outside the umbrella of the bankruptcy case." Ritzen Grp., Inc. v. Jackson Masonry, LLC, 140 S. Ct. 582, 586 (2020) (citing 11 U.S.C. § 362(a)). Despite the automatic stay, Lendgreen repeatedly contacted Coughlin seeking repayment of his debt. Though Coughlin told Lendgreen representatives that he had filed for bankruptcy and provided his attorney's contact information, Lendgreen continued to call and email him directly. Two months after he filed the petition, Coughlin attempted suicide. He attributes that attempt to his belief that his "mental and financial agony would never end," and blamed his agony on Lendgreen's "regular and incessant telephone calls, emails and voicemails."

To stop Lendgreen's collection efforts, Coughlin moved to enforce the automatic stay against Lendgreen and its corporate

_____

See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 29 (1st Cir. 2000).

- 4 -

parents, including the Band.  He sought an order prohibiting further collection efforts as well as damages, attorney's fees, and expenses.  In response, the Band and its affiliates asserted tribal sovereign immunity and moved to dismiss the enforcement proceeding.  The bankruptcy court agreed with the Band and granted the motions to dismiss.  See In re Coughlin, 622 B.R. at 494.

We permitted a direct appeal from that decision, see 28 U.S.C. § 158(d), and now reverse.[2]

## II.

We review de novo the Bankruptcy Court's determination of a pure question of law.  In re IDC Clambakes, Inc., 727 F.3d 58, 63 (1st Cir. 2013).

## A.

Congress may abrogate tribal sovereign immunity if it "'unequivocally' express[es] that purpose."[3]  Michigan v. Bay Mills

---

[2]    We acknowledge and thank the following amici curiae for their submissions in support of the Band: the Native American Financial Services Association and Professors Seth Davis, Matthew L.M. Fletcher, Joseph William Singer, Angela R. Riley, Kristen A. Carpenter, Adam Crepelle, Gregory Ablavsky, Bethany Berger, Alexander T. Skibine, and Addie C. Rolnick.

[3]    The same standard applies to states.  See, e.g., Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55 (1996) ("In order to determine whether Congress has abrogated the States' sovereign immunity, we ask . . . whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity.'" (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)) (alteration in original)).

- 5 -

Indian Cmty. 572 U.S. 782, 790 (2014) (quoting C & L Enters., Inc. v. Citizen Band Potawatomi Tribe of Okla., 532 U.S. 411, 418 (2001)). "That rule of construction reflects an enduring principle of Indian law: Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government." Id.

To abrogate sovereign immunity "Congress need not state its intent in any particular way." FAA v. Cooper, 566 U.S. 284, 291 (2012). The Supreme Court has "never required that Congress use magic words" to make its intent to abrogate clear. Id. To the contrary, it has explained that the requirement of unequivocal abrogation "'is a tool for interpreting the law' and that it does not 'displac[e] the other traditional tools of statutory construction.'" Id. (quoting Richlin Sec. Serv. Co. v. Chertoff, 553 U.S. 571, 589 (2008)) (alteration in original); cf. Penobscot Nation v. Frey, 3 F.4th 484, 493, 503 (1st Cir. 2021) (en banc) (holding that the Indian canons play no role in interpreting an unambiguous statute), cert. denied No. 21-838, 2022 WL 1131375 (U.S. Apr. 18, 2022).

In determining whether the Bankruptcy Code unequivocally abrogates tribal sovereign immunity, we begin with the text. Section 106(a) of the Code provides that "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section

with respect to" dozens of provisions of the Code, including the automatic stay. Congress enacted § 106 in 1994 to overrule two Supreme Court cases, which held that a prior version of the section was insufficiently clear to abrogate state and federal sovereign immunity. 140 Cong. Rec. 27693 (Oct. 4, 1994) (citing Hoffman v. Conn. Dep't of Income Maint., 492 U.S. 96 (1989) and United States v. Nordic Vill., Inc., 503 U.S. 30 (1992)). The provision's plain statement satisfies Congress' obligation to unequivocally express its intent to abrogate immunity for all governmental units.

We thus focus on whether Congress intended to abrogate tribal sovereign immunity when it used the phrase "governmental unit." Section 101(27) of the Code, enacted as part of the Bankruptcy Reform Act of 1978, defines "governmental unit" capaciously as:

> United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

11 U.S.C. § 101(27). That enumerated list covers essentially all forms of government. See Krystal Energy, 357 F.3d at 1057 ("[L]ogically, there is no other form of government outside the foreign/domestic dichotomy . . . ."). The issue is then whether a tribe is a domestic government.

- 7 -

First, there is no real disagreement that a tribe is a government. Tribes are not specifically excluded and fall within the plain meaning of the term governments. Tribes are governments because they act as the "governing authorit[ies]" of their members. Government, Webster's Third New International Dictionary 982 (1961); accord government, The Random House Dictionary of the English Language 826 (2d ed. 1987) ("[T]he governing body of people in a state, community, etc.; administration."). While tribes have limited authority over non-members, they exercise sovereignty over their members and territories. See Atkinson Trading Co. v. Shirley, 532 U.S. 645, 650-51 (2001). As examples, "Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members," Montana v. United States, 450 U.S. 544, 564 (1981); see, e.g., Constitution and Bylaws of the Lac Du Flambeau Band of Lake Superior Chippewa Indians of Wisc., art. VI, https://www.ldftribe.com/uploads/files/Court-Ordinances/CONSTITUTION%20AND%20BYLAWS.pdf, and also largely retain the authority to prosecute members for offenses committed in their territories, 18 U.S.C. § 1152; see Negonsott v. Samuels, 507 U.S. 99, 102-03 (1993). Indeed, the very purpose of tribal sovereign immunity is to protect "Indian self-government." Bay Mills, 572 U.S. at 790.

Second, it is also clear that tribes are domestic, rather than foreign, because they "belong[] or occur[] within the sphere of authority or control or the . . . boundaries of" the United States. Domestic, Webster's Third, supra, at 671.[4] Thus, a tribe is a domestic government and therefore a government unit.

This conclusion is drawn from the text. It is also supported by historical context. When Congress abrogated immunity in 1994, it did so against the preexisting backdrop of § 101(27). Indeed, at least one published bankruptcy opinion shows an understanding even before 1978 that tribes could function as and claim the benefits of governments. See In re Bohm's Inc., 5 Bankr. Ct. Dec. 259, 259 (Bankr. D. Ariz. 1979) (prohibiting discharge of and prioritizing fees owed to tribe under pre-1978 bankruptcy law). As Coughlin argues, Congress was aware of the existing definition of "governmental unit" when it incorporated it into § 106. The Band wants to ignore that point. But the Code was clear in 1994 that tribes were governmental units. As a result, the Band's focus on § 106 as though it were freestanding is simply misplaced.

---

[4] The dissent implies that we have cherry-picked that definition. Not so. See, e.g., domestic, The Random House Dictionary of the English Language 581 (2d ed. 1987) ("[O]f or pertaining to one's own or a particular country as apart from other countries . . . ."); domestic, The American Heritage Dictionary 416 (2d college ed. 1982) ("Of or pertaining to a country's internal affairs."); domestic, Webster's New Collegiate Dictionary 338 (1975) ("[O]f, relating to, or carried on within one and esp. one's own country[.]").

Were that not enough, Congress was also well aware when it enacted § 101(27) in 1978 and § 106 in 1994 that Indian tribes were legally "domestic dependent nations."  All three branches of government have long used the phrase.  Chief Justice Marshall coined it in 1831.[5]  Cherokee Nation v. Georgia, 30 U.S. 1, 17 (1831).  Since at least 1853, the Executive Branch too has adopted the phrase.[6]  See Conts. of the Potawatomie Indians, 6 Op. Att'y Gen. 49, 54 (1853).  Members of Congress have used the phrase as well since at least 1882, see 13 Cong. Rec. S2804, S2806 (Apr. 12, 1882) (statement of Sen. Garland), including Members of Congress referring to "domestic dependent nations" on the floor during the sessions when Congress enacted the relevant provisions of the Code, 139 Cong. Rec. 26542 (Oct. 28, 1993) (statement of Rep. Thomas); 124 Cong. Rec. 8380 (Apr. 3, 1978) (statement of Sen. Hatch).  Indeed, Senator Hatch, who discussed Cherokee Nation in depth on

---

[5]  The Supreme Court has repeated that formulation many times.  See Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 509 (1991); Duro v. Reina, 495 U.S. 676, 699 (1990) (Brennan, J., dissenting); Brendale v. Confederated Tribes & Bands of Yakima Indian Nation, 492 U.S. 408, 451 (1989); Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 169 n.18 (1982) (Stevens, J., dissenting); Baker v. Carr, 369 U.S. 186, 215 (1962); Roff v. Burney, 168 U.S. 218, 221 (1897).

[6]  The phrase appears in opinions and adjudications across the Executive Branch.  See, e.g., Bay Bancorporation Green Bay, Wisconsin, 1995 WL 356948, at *1 (F.R.B. June 14, 1995); Appeal of Devil's Lake Sioux Tribe, 94 Interior Dec. 101, 118 (IBIA 1987); Powers of Indian Tribes, 55 Interior Dec. 14, 47 (1934); Timber on Indian Lands, 19 Op. Att'y Gen. 232, 233 (1889).

the floor in 1978 and knew that "[t]he peculiar status of Indian tribes was defined by Chief Justice Marshall . . . as that of 'domestic dependent nations,'" 124 Cong. Rec. 8380, was the ranking member of the Judiciary Committee when it marked up the 1994 amendments to the Code. In light of this consistent use across government, we have no doubt that Congress understood tribes to be domestic dependent nations.

As domestic dependent nations are a form of domestic government, it follows that Congress understood tribes to be domestic governments. The phrases are functionally equivalent. In both phrases, "domestic" means the same thing: occurring within the boundaries of the United States. Compare Cherokee Nation, 30 U.S. at 17 ("The Indian territory is admitted to compose a part of the United States.") with domestic, Webster's Third, supra, at 671. Nation, in the sense Chief Justice Marshall used it in Cherokee Nation, refers to a government.[7] Dependent simply refers to a subset of nations or governments. Id. at 17; see United States v. Cooley, 141 S. Ct. 1638, 1643 (2021). Taken together,

_____

[7] Cherokee Nation discusses tribes as dependent nations to discuss the extent of their sovereign powers and to contrast their limited sovereignty with the full sovereignty of full nation-states. See 30 U.S. at 16-17. The salient characteristic is the power to make and apply laws. See sovereignty, II Bouiver's Law Dictionary 406-407 (Lawbook Exch. 2012) (1839); see also sovereign power, T.W. Williams, A Compendious and Comprehensive Law Dictionary (Lawbook Exch. 2006) (1816).

then, the phrase "domestic dependent nation" refers to a form of domestic government.

Thus, when Congress enacted §§ 101(27) and 106, it understood tribes to be domestic governments, and when it abrogated the sovereign immunity of domestic governments in § 106, it unmistakably abrogated the sovereign immunity of tribes.

Finally, we draw additional support from the Bankruptcy Code's structure. Congress did not just strip immunity. It also granted benefits. Because we must presume that Congress uses a defined phrase consistently in the same statute, see Azar v. Allina Health Servs., 139 S. Ct. 1804, 1812 (2019), the definition of governmental unit applies across the Code. As a result, tribes also enjoy the special benefits afforded to governmental units under the Code, such as priority for certain unsecured claims, see 11 U.S.C § 507(a)(8), and certain exceptions to discharge, see id. § 523(a). Many of those benefits enable governmental units, including tribes, to collect tax revenue. See, e.g., id. §§ 362(b) (excepting tax audits and liens from the automatic stay), 507(a)(8) (giving priority to certain tax claims), 523(a) (prohibiting discharge of fines and taxes), 1305 (allowing post-petition tax claims). Thus, in practice, tribes benefit from their status as governmental units. Moreover, tribal self-determination -- the animating force behind modern federal Indian policy -- benefits when tribes can collect taxes. These practical and policy

considerations bolster our conclusion that tribes are governmental units and thus that the Code abrogates tribal sovereign immunity.

## III.

The Band and our dissenting colleague offer many arguments for immunity. None persuade us.

### A.

The Band contends that Congress cannot abrogate tribal sovereign immunity unless it expressly discusses tribes somewhere in the statute. But controlling Supreme Court precedent forecloses that argument. See Cooper, 566 U.S. at 291. The Band purports to contravene the text by reliance on silence in the legislative history. And it also tries to rely on canons of construction that we use only to resolve ambiguity. Those arguments, however, falter in the face of the Bankruptcy Code's clear text. See Penobscot Nation, 3 F.4th at 493, 503.

The Band primarily argues that the Bankruptcy Code cannot abrogate tribal sovereign immunity because it never uses the word "tribe." It points to Greektown, in which the Sixth Circuit held that the Bankruptcy Code did not abrogate tribal sovereign immunity because it "lack[s] the requisite clarity of intent."[8] 917 F.3d at 461. To reach that conclusion, Greektown

---

[8] The Band also cites Meyers v. Oneida Tribe of Indians of Wisconsin, 836 F.3d 818 (7th Cir. 2016) and In re Whitaker, 474 B.R. 687 (B.A.P. 8th Cir. 2012). Greektown largely adopted the

- 13 -

explained that "[e]stablishing that Indian tribes are domestic governments does <u>not</u> lead to the conclusion that Congress unequivocally meant to include them when it employed the phrase 'other foreign or domestic government.'" <u>Id.</u> at 460 (emphasis in original). That contention cannot be correct. Congress must abrogate immunity explicitly. It has done so here, as expressly eliminating immunity as to governmental units, which, as we have explained, include tribes.

The Band's argument boils down to a magic-words requirement. <u>See</u> <u>Greektown</u>, 917 F.3d at 460 ("[T]here is not one example in all of history where the Supreme Court has found that Congress intended to abrogate tribal sovereign immunity <u>without</u> expressly mentioning Indian tribes somewhere in the statute." (quoting <u>Meyers</u>, 836 F.3d at 824) (emphasis in original)). And <u>Cooper</u> forbids us from adopting a magic-words test. <u>See</u> 566 U.S. at 291. In making that argument, the Band advocates an even more extreme position than the one the Sixth Circuit adopted in <u>Greektown</u>.[9] That Congress took a belt-and-suspenders approach in

---

Seventh Circuit's reasoning in <u>Meyers</u>. <u>See</u> 917 F.3d at 458-61. We note that <u>Meyers</u> dealt with a different statute, the Fair and Accurate Credit Transaction Act. But to the extent that the same logic applies to both statutes, we reject <u>Meyers</u> for the same reasons we reject <u>Greektown</u>. We also reject <u>Whitaker</u>, which expressly requires "magic words" to abrogate tribal sovereign immunity. <u>See</u> 474 B.R. at 695. As we explain, <u>Cooper</u> forbids such a rule. <u>See</u> 566 U.S. at 291.

[9] The Sixth Circuit suggested that Congress could avoid using

- 14 -

drafting an unmistakably broad provision does not somehow narrow the text or obscure Congress' intent. See Facebook, Inc. v. Duguid, 141 S. Ct. 1163, 1172 n.7 (2021); see generally E. Leib & J. Brudney, The Belt-and-Suspenders Canon, 105 Iowa L. Rev. 735 (2020).

The Band next argues from the lack of a specific discussion of tribes in the legislative history. Cooper again supplies the response. "Legislative history cannot supply a waiver that is not clearly evident from the language of the statute." 566 U.S. at 290 (citing Lane v. Peña, 518 U.S. 187, 192 (1996)). The inverse is also true: legislative history cannot introduce ambiguity into a clear statute. Penobscot Nation, 3 F.4th at 491 (citing Carcieri v. Salazar, 555 U.S. 379, 392 (2009)). That maxim is never truer than when the legislative history is silent. See Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1143 (2018) ("Silence in the legislative history, no matter how clanging, cannot defeat the better reading of the text and statutory context." (quotation marks omitted) (quoting Sedima, S.P.R.L. v.

_____

the word tribe if it said that "'sovereign immunity is abrogated as to all parties who could otherwise claim sovereign immunity.'" Greektown, 917 F.3d at 461 n.10 (quoting Krystal Energy, 357 F.3d at 1058). But its explanation goes astray because Congress essentially adopted that formulation in the Bankruptcy Code. See Krystal Energy, 357 F.3d at 1057 ("[L]ogically, there is no other form of government outside the foreign/domestic dichotomy . . . .").

- 15 -

Imrex Co., 473 U.S. 479, 495 n.13 (1985))).  Nor would we necessarily expect a discussion of tribes when they so clearly fit within the text of the statute, as we have discussed.  The lack of discussion of tribes in the legislative history cannot introduce ambiguity into an unambiguous statute.[10]

The Band then turns to canons of construction which, because they apply only to ambiguous statues, offer it no support.  Without ambiguity, the Indian canons of construction play no role in our analysis.  Penobscot Nation, 3 F.4th at 493, 503.  Nor does the ejusdem generis canon support the Band's position.[11]  True, we draw the meaning of "other foreign or domestic government" from the preceding enumeration of governments.  See Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1625 (2018).  True as well, the relevant category is governments like the federal government, states, territories, municipalities, and foreign states and instrumentalities of the federal government, states, territories, municipalities, and foreign states.  Neither of those points,

---

[10] The dissent also notes that the legislative history is silent about tribes.  But as the dissent admits, in determining whether Congress has abrogated sovereign immunity, we must look only to the language of the statute and not to legislative history. Dissenting Op. at 54 (citing Hoffman, 492 U.S. at 96); see also Hoffman, 492 U.S. at 104.

[11] The Band references both ejusdem generis and noscitur a sociis.  Because "other foreign or domestic government" is a catch-all phrase following a specific list, ejusdem generis is the relevant canon.  See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 195-199, 205 (2012).

however, cuts against our reading.  All are forms of government.  All, except municipalities, enjoy some immunity from unconsented suit.  If tribes are not domestic governments, it must be because they are different in some relevant way from governments like territories.  We look to governmental functions in interpreting § 101(27).  See TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 931 (1st Cir. 1995).  We see no functional difference that would allow us to conclude that Congress intended tribes to fall outside the definition of governmental unit.[12]

**B.**

The dissent construes the phrase "domestic governments" to mean only those governments that trace their origins to the Constitution.  Dissenting Op. at 39.  But we cannot adopt that construction without imposing new rules on how Congress may legislate in violation of controlling Supreme Court precedent because the text does not permit such a reading.

The dissent offers no reason to think that Congress intended to limit the list of domestic governments to those "that can trace [their] origins either to our federal constitutional system of government or to that of some 'foreign state.'"  In injecting the constitutional character of an entity into ordinary

---

[12]    The dissent also draws on the ejusdem generis canon in making a related point, which we reject for similar reasons.  See infra Part III.B.

- 17 -

statutory interpretation the dissent proposes a radical new rule of construction -- one never previously adopted by any court, never briefed by the parties, and certainly never within Congress' contemplation. We are interpreting the phrase domestic government as Congress enacted it in 1979; we are not interpreting what a provision of the Constitution meant at the Framing. In support of its departure from established principles of statutory interpretation, the dissent offers, at best, only a definition of the word domestic as "pertaining, belonging or relating to . . . the place of birth, origin, creation, or transaction." Dissenting Op. at 39 (quoting domestic, Black's Law Dictionary (5th ed. 1979)). But the dissent can only apply that definition by stripping it of context. When referring to products, the word domestic is used to describe origins: we refer to domestic cars and domestic beers. The word does not, however, carry those connotations when it refers to governments. Compare domestic, Oxford English Dictionary 944 (2d ed. 1989) ("Indigenous; made at home or in the country itself; native, home-grown, home-made."), with id. ("Of or pertaining to one's own country or nation; not foreign, internal, inland, 'home'."). The dissent protests that both definitions are available; only one, however, works in context. Moreover, the phrase appears in a classic dichotomy between the words "foreign" and "domestic," which supports our understanding that the word domestic refers to the territory in

which the government exists. And even if the word "domestic" could bear the meaning the dissent ascribes to it, we have no reason to choose an obscure use of the word over an obvious one. In applying ejusdem generis, the genus should be "obvious and readily identifiable." Scalia & Garner, supra at 199.

The dissent's reasoning fails to apply the ordinary meaning of an unambiguous statute -- which uses words long understood to refer to tribes -- because Congress did not expressly refer to "tribes." "[R]equring Congress to use magic words to accomplish a particular result . . . violates the baseline rule of legislative supremacy." A. Barrett, Substantive Canons and Faithful Agency, 90 Boston Univ. L. Rev. 109, 166-67 (2010). There is no inconsistency between the avoidance-of-magic-words rule and the clear-statement rule for abrogating sovereign immunity. The clear-statement rule "'is a tool for interpreting the law' and . . . it does not 'displac[e] the other traditional tools of statutory construction.'" Cooper, 566 U.S. at 291 (quoting Richlin Sec. Serv. Co. v. Chertoff, 553 U.S. 571, 589 (2008)) (alteration in original). Yet the dissent has transformed that interpretive tool into a substantive hurdle for Congress to overcome. The dissent does suggest at one point that the phrase "every government" would meet its standard. Dissenting Op. at 37 n.16, 47. But to require that phrase transgresses Cooper's prohibition

on magic words no less than requiring "tribes" to appear in the statute.

The dissent equates our accepted and standard dictionary-based meaning of the phrase "domestic government" with its preferred and uncommon definition. But they are not the same. An interpretation of the phrase "domestic government" that excludes Indian tribes with no textual basis for so doing is implausible. Cf. United States v. Ojeda Rios, 495 U.S. 257, 263 (1990) (holding implausible a narrow reading of a statute that disregards context). For the dissent's preferred reading to work, we would need some reason to believe that Congress intended the word "domestic" to apply to place of origin. The dissent offers none. By the same logic, "domestic government" could refer to household management. But in this context, it certainly does not. Nor, in this context, does it refer to place of origin.

We also briefly respond to a few objections the dissent raises to our interpretation of § 101(27).

The dissent responds to our surplusage analysis, contending that the phrase "other domestic governments" would have meaning even if it did not encompass tribes. The dissent would read the phrase to refer only to "half-fish, half-fowl governmental entities like authorities or commissions that are created through interstate compact." Dissenting Op. at 31-32; see also id. at 42. The problem with that claim is that an agency created by interstate

- 20 -

compact enjoys an immunity only as an instrumentality of its creator states. See Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 40-44 (1994); Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency, 440 U.S. 391, 401 (1979). Nor does the singular form of the governments listed in § 101(27) matter. Congress has instructed us not to fret over whether a statute uses a word in its singular or plural form: "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise[] words importing the singular include and apply to several persons, parties, or things[] [and] words importing the plural include the singular[] . . . ." 1 U.S.C. § 1. Through that lens, § 101(27) refers to an "instrumentality . . . of State[s]." The definition thus includes interstate-compact agencies. The dissent offers no other examples of governments that would fit the phrase, nor have we found any. And so, if we interpret the phrase to exclude tribes, we are left with surplusage.

The dissent also points to Congress' inclusion of "municipalities" in the definition of governmental units as incongruous because municipalities do not possess sovereign immunity. See Owen v. City of Independence, 445 U.S. 622, 645–46 (1980). That argument, which the Band never made and which Coughlin had no opportunity to address, does not work. The definition applies across the code. It is not odd that Congress wanted municipalities to be treated like other governments for

- 21 -

other purposes.  See, e.g., 11 U.S.C §§ 362(b), 507(a)(8), 523, 1305.[13]

## IV.

We reverse the decision of the bankruptcy court dismissing Coughlin's motion to enforce the automatic stay and remand for further proceedings consistent with this opinion.

**- DISSENTING OPINION FOLLOWS -**

---

[13]    In yet another argument not advanced by the Band, the dissent seeks support for its statutory interpretation from a Department of Agriculture regulation, which defines "governmental entity" for the purposes of an organic food marketing program as "[a]ny domestic government, tribal government, or foreign governmental subdivision providing certification services." Dissenting Op. at 45 (citing 7 C.F.R. § 205.2).  The meaning Congress gave to an unrelated statute does not change when the Administrator of the Agricultural Marketing Service decides to add a possibly superfluous phrase to a regulation.  Nor should we draw meaning from the fact that an agency once distinguished between domestic governments and tribal governments, especially because federal agriculture law often singles out "tribal governments." See, e.g., 7 U.S.C. §§ 950bb, 1632c, 1639p, 2671, 6923, 7518, 7655d, 2204b-3, 2009bb-1.

**BARRON, Chief Judge, dissenting**.  Indian tribes enjoy immunity from suit as a "core aspect[] of [their] sovereignty." Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 788 (2014). Thus, just as Congress generally may abrogate state sovereign immunity only by stating its intent to do so "clear[ly]" and "unequivocal[ly]," Congress generally may abrogate tribal sovereign immunity only with that same degree of clarity.  See id. at 790 (quoting C&L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla., 532 U.S. 411, 418 (2001)).

Here, of course, the question of whether Congress has abrogated tribal sovereign immunity arises in connection with the federal Bankruptcy Code ("Code").  That is potentially significant because Congress's constitutional power to make uniform bankruptcy law presents a special case when it comes to the abrogation of state sovereign immunity.  Cf. Cent. Va. Cmty. Coll. v. Katz, 546 U.S. 356, 362, 379 (2006) (holding that "the Bankruptcy Clause . . . reflects the States' acquiescence in a grant of congressional power to subordinate to the pressing goal of harmonizing bankruptcy law sovereign immunity defenses that might have been asserted in bankruptcy proceedings").

No argument has been made to us, however, that this same constitutional power permits Congress to abrogate Indian tribes' sovereign immunity in the Code without doing so clearly and unequivocally.  We thus confront in this appeal an abrogation

- 23 -

question regarding tribal immunity under the Code that is statutory rather than constitutional in nature.

The statutory question implicates two provisions of the Code: 11 U.S.C. § 106, which expressly abrogates the immunity from suit of a "governmental unit" as to certain specifically enumerated Code provisions, and 11 U.S.C. § 101(27), which separately defines that critical term. The parties agree that the clear and unequivocal abrogation of immunity for "governmental unit[s]" in § 106 applies to a case that, like this one, involves a debtor's motion for damages against a creditor for willfully violating the automatic stay that has been in place since the debtor filed for bankruptcy. See 11 U.S.C. § 362(k)(1) (authorizing "an individual injured by any willful violation of a stay" to "recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, . . . punitive damages"). They further agree that the debtor in this case, Brian Coughlin, is seeking damages pursuant to § 362(k)(1) against a creditor that is entitled to assert the immunity from suit that Indian tribes generally enjoy, due to that creditor's ties to the Lac du Flambeau Band of Lake Superior Chippewa Indians. Thus, the sole question for us is a discrete but novel one in our Circuit: Did Congress clearly and unequivocally define a "governmental unit" in § 101(27) to include an Indian tribe? As I will explain, in my view, Congress did not.

# I.

Section 101(27) defines the term "governmental unit" as follows:

> United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

11 U.S.C. § 101(27) (emphasis added).

As is evident from this text, Congress did not mention Indian tribes in this definition. As is also evident from this text, Congress did not do so even though it did name many governmental types, including some that, like Indian tribes, enjoy an immunity from suit that Congress may abrogate only clearly and unequivocally. See, e.g., Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 240 (1985) (articulating the abrogation standard for states' sovereign immunity).

Thus, a reader interested in knowing whether Indian tribes are "governmental unit[s]" cannot help but notice that Congress, for some reason, did not use the surest means of clearly and unequivocally demonstrating that they are. Nor can such a reader -- if reasonably well informed -- help but notice that Congress chose not to do so even though Indian tribes are hardly an obscure type of immunity-bearing sovereign and even though

Congress has expressly named them when abrogating their sovereign immunity in every other instance in which a federal court has found that immunity to have been abrogated. See, e.g., Kiowa Tribe of Okla. v. Mfg. Tech., Inc., 523 U.S. 751, 758 (1998) (listing instances in which tribal immunity was abrogated through explicit mention of Indian tribes); see also In re Greektown Holdings, LLC, 917 F.3d 451, 460 (6th Cir. 2019) (stating that neither the Sixth Circuit nor the Seventh Circuit was able to find even "one example in all of history where the Supreme Court has found that Congress intended to abrogate tribal sovereign immunity without expressly mentioning Indian tribes somewhere in the statute" and noting that "there is only one example at the circuit court level," Krystal Energy Co. v. Navajo Nation, 357 F.3d 1055 (9th Cir. 2004), which interprets the same provisions of the Bankruptcy Code at issue in this case (emphasis in original) (quoting Meyers v. Oneida Tribe of Indians of Wis., 836 F.3d 818, 824 (7th Cir. 2016))); Krystal Energy Co., 357 F.3d at 1059 (noting that the Ninth Circuit could "find no other statute in which Congress effected a generic abrogation of [tribal] sovereign immunity" without specifically naming Indian tribes).

In fact, if unusually well informed, such a reader could not help but notice one more thing, too. Congress made express reference to "Indian Territory" in a precursor attempt to set the rules of the road for bankruptcy under federal law. See Bankruptcy

- 26 -

Act of July 1, 1898, 30 Stat. 544, 544 (1898). Yet, in the provision of the Code addressing whether Indian tribes would retain their sovereign immunity, Congress for some reason chose not to make any mention of Indian tribes at all.

The obvious question for such a reader, then, is why? Why, if Congress wanted to be crystal clear in abrogating tribal immunity through the Code, did it not use the clearest means of abrogating that immunity by including "Indian Tribe" -- or its equivalent -- in the list of expressly named governmental types that makes up the bulk of § 101(27)?

One possible answer is quite straightforward: Congress did not mention Indian tribes in § 101(27) because Congress did not intend to include them as "governmental unit[s]." See In re Greektown Holdings, LLC, 917 F.3d at 462 ("Congress's failure to [explicitly mention Indian tribes], after arguably mentioning every other sovereign by its specific name, likely constitutes '[a] circumstance[] supporting [the] sensible inference' that Congress meant to exclude them, pursuant to the familiar expressio unius canon." (alteration in original) (quoting Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 81 (2002))).

The majority rejects that straightforward answer. It holds that § 101(27)'s trailing "or other . . . domestic government" phrase, which itself makes no mention of Indian tribes, nonetheless does for them what that same statutory provision's

- 27 -

preceding express list does not: clearly and unequivocally define tribes to be "governmental unit[s]."

In other words, the majority is of the view that Congress thought both that it would be perfectly clear to any reader that the general phrase "other . . . domestic government[s]" encompasses Indian tribes and that it would not be similarly clear to any reader that this same phrase encompasses either "United States; State; Commonwealth; District; Territory; municipality; foreign state," or a "department, agency, or instrumentality of the United States . . . , a State, a Commonwealth, a District, a Territory," or "a municipality."  11 U.S.C. § 101(27).  And so, the majority apparently thinks, Congress saw a need to name expressly each of those governmental types, but no similar need to name Indian tribes.

That understanding of congressional intent is -- to my mind, at least -- hardly intuitive.  But, I do not make that observation to suggest that Congress must name Indian tribes to abrogate their immunity.  I make it only to emphasize that it is not enough for us to conclude that the phrase "or other . . . domestic government" could be read to encompass Indian tribes. Rather, for us to adopt that reading, we must have "perfect confidence" in it, Dellmuth v. Muth, 491 U.S. 223, 231 (1989),[14]

---

[14] As the majority points out, the "clear and unequivocal

because that reading attributes to Congress an intention to abrogate a "core aspect[] of [tribal] sovereignty," Bay Mills

---

standard" for abrogation is the same for states and for tribes, see Maj. Op. at 5 n.3 ("In order to determine whether Congress has abrogated the States' sovereign immunity, we ask . . . whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity.'" (alteration in original) (quoting Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55 (1996))), notwithstanding that tribal immunity and state sovereign immunity emanate from different legal sources and are not perfectly coextensive, Kiowa Tribe of Okla., 523 U.S. at 755-56. Thus, because the "perfect confidence" requirement set forth Dellmuth is a gloss on the "clear and unequivocal" standard, it applies to the abrogation of tribal immunity as well.

I do recognize that the question that we face here concerns the scope of a definition that applies throughout the Code. And, while this feature of § 101(27) could suggest that the "clear and unequivocal" standard does not apply to the interpretation of that provision's definition of "governmental unit," neither party has raised such an argument to us. Moreover, the history of § 101(27)'s enactment supports applying the "clear and unequivocal" standard to it, as Congress defined the term "governmental unit" at the same time that it enacted § 106, which used that same term to abrogate sovereign immunity. See 11 U.S.C. §§ 101(27) & 106 (1978). I thus proceed on the assumption -- as do the parties, the majority, and all the circuits that have ruled on this issue -- that the "clear and unequivocal" standard applies to the interpretive question we face here. It is especially prudent to do so, I should add, given that if the "clear and unequivocal" standard were inapplicable, we would be left with the question whether the Indian canon of construction would apply, such that, as the Band here separately contends, the definition of "governmental unit" within the Code should be read not to abrogate an Indian tribe's immunity from suit on this basis alone. See White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143-44 (1980) ("Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence."); Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 269 (1992) (explaining that a "[s]tatute[] [is] to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit") (quoting Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985))).

- 29 -

Indian Cmty., 572 U.S. at 788; see also United States v. Nordic Village, Inc., 503 U.S. 30, 37 (1992) (explaining that if it is "plausible" to read a statute as not abrogating a sovereign's immunity from suit, that "is enough to establish that . . . [it] is not 'unambiguous'" that statutory provision abrogates that sovereign's immunity).  Hence, the key question that is my focus in what follows:  does the majority's reading of § 101(27) justify our having "perfect confidence" in it?

## II.

I recognize that one argument for concluding that the phrase "other . . . domestic government" must encompass Indian tribes is that, otherwise, the phrase would have no meaning at all.  The phrase must be referring to something, and so, if not Indian tribes, then what?  See Corley v. United States, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004))).

But, I do not see how the canon against surplusage can engender the kind of confidence in the majority's Indian tribe-inclusive reading that is required, given the immunity-abrogating effect that such a reading would have, insofar as the statutory text otherwise cannot.  For, even if the phrase "or other . . . domestic government" were not read to include Indian tribes, it

still could be read to pick up otherwise excluded, half-fish, half-fowl governmental entities like authorities or commissions that are created through interstate compacts, just as the phrase "or other foreign . . . government" similarly could be read to pick up the joint products of international agreements. See, e.g., Atlantic States Marine Fisheries Commission, http://www.asmfc.org/about-us/program-overview (last visited April 12, 2022) (a body consisting of representation from fifteen states responsible for fishery management); cf. Jam v. Int'l Fin. Corp., 139 S. Ct. 759, 765 (2019) (discussing sovereign immunity in the context of international organizations, such as the World Bank).

In fact, the trailing phrase in § 101(27) seems quite well-suited to that modest, residuum-defining function. Such joint entities are not susceptible of the kind of one or two-word description ("Interstate Commission, Authority or the Like"? "Products of compacts or agreements"?) that -- like Indian tribes themselves -- each of the expressly listed types of foreign or domestic governments is. Nor do any other words in § 101(27) lend themselves to a construction that would encompass such odd governmental hydras.

The majority contends in response that these types of entities are already encompassed within § 101(27)'s definition of "governmental unit" as "instrumentalit[ies] . . . of a State,"

- 31 -

such that the residual phrase "or other . . . domestic government" need not apply.  See Maj. Op. at 20-21.  But, why would we think such a joint entity is an "instrumentality" of a "State" when it is a body that is formed by more than one State through an interstate compact blessed by Congress and has a regulatory purview greater than that of a single state?  See, e.g., Atlantic States Marine Fisheries Commission, http://www.asmfc.org/about-us/program-overview (last visited April 12, 2022) (noting that the Commission's fishery management plans are binding on all the Atlantic coast states that the plans apply to and that noncompliant states can be fined or face a fishing moratorium).[15]

Moreover, if the majority is right that such joint-State entities are "instrumentalities' of "a State," then what meaning would the phrase "other . . . domestic government" at issue have? Is the majority suggesting that Congress included the trailing phrase "other domestic government" for the sole purpose of including Indian tribes?  If so, is it of the view that Congress had Indian tribes -- and only Indian tribes -- in mind in using

---

[15] The majority notes that that "an agency created by interstate compact enjoys an immunity only as an instrumentality of its creator states."  See Maj. Op. at 20.  But, the fact that such interstate agencies can have sovereign immunity, does not mean that the phrase "instrumentalit[ies] . . . of a State," refers to such entities, as the definition of "governmental unit" is used throughout the Code and includes non-sovereign-immunity-bearing entities like municipalities.  And, nothing in Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30 (1994), says otherwise, because that case was not construing that provision of the Code.

that phrase but nonetheless thought it clearest not to name them and to refer to them instead in only much more general terms, notwithstanding Congress's obligation to abrogate Indian tribes' immunity only clearly and unequivocally?

Of course, even if the canon against surplusage does not provide the requisite clarity, the text itself -- unaided by any helping canon -- might do so on its own. And, the majority does conclude, like the Ninth Circuit, that there is no need to resort to an interpretive canon to find by inference that Indian tribes clearly and unequivocally fall within § 101(27) because the ordinary meaning of the phrase "domestic government" compels that finding directly.

As the Ninth Circuit puts the point, "Indian tribes are certainly governments," and there is no space between the "foreign/domestic dichotomy, unless one entertains the possibility of extra-terrestrial states." Krystal Energy Co., 357 F.3d at 1057. Thus, the Ninth Circuit concludes that it follows that an Indian tribe is, like any "government," necessarily "domestic" insofar as it is not -- and neither party here suggests that an Indian tribe is -- "foreign," such that an Indian tribe necessarily is a "domestic government." Id. But, as I will next explain, this logic is not as airtight as it might seem.

The juxtaposition of "domestic" and "foreign" in § 101(27) shows -- as the majority appears to agree -- that Congress intended the adjective "domestic" to refer here to the "United States" -- in some fashion -- and not to what is "foreign" to it. Thus, the scope of the class "or other . . . domestic government" depends on the nature of the tie that Congress had in mind between a "government" and the United States, as, given the statutory text, it is a government's tie to the United States -- and not to what is "foreign" to the United States -- that makes it "domestic."

From that uncontroversial premise, the Ninth Circuit and the majority then each goes on to conclude that the words "domestic" and "foreign" combine to make it perfectly clear that any "government" that operates within the metes and bounds of the physical territory that the United States encompasses has the kind of tie to the United States that makes it not "foreign," and thus a "domestic government." See id. The majority supports this conclusion by pointing to a definition in standard usage, from the time § 101(27) was enacted, of "domestic," which is "'occur[ring] within . . . the . . . boundaries of'" the "domestic" -- i.e., non-"foreign" -- place in question. Maj. Op. at 9 (quoting domestic, Webster's Third New International Dictionary 671 (1961)); see also Maj. Op. at 9 n.4 (defining domestic as "[o]f,

relating to, or carried on within one and esp. one's own country" (quoting domestic, Webster's New Collegiate Dictionary 338 (1975))).

I do not dispute that such a reading is a possible one. Indian tribes -- insofar as they are a species of "government," cf. In re Whitaker, 474 B.R. 687, 695 (B.A.P. 8th Cir. 2012) (questioning whether Indian tribes, in light of their status as "nations," are best understood to be "government[s]" referenced in § 101(27)) -- operate within the United States as a geographic location and not, in that same territorial sense, within any place that is "foreign" to it.  So, I can see how the statutory text could be read as the majority reads it -- especially if we focus only on its trailing phrase in isolation.

But, given the interpretive task in which we are engaged, it is not enough for us to be convinced that the text could be read to include Indian tribes.  Indeed, it is not even enough for us to be convinced that, all else equal, the better reading of the text is that it does include Indian tribes.  Rather, because we are trying to determine whether Congress -- through that phrase -- abrogated tribal sovereign immunity, we must be convinced that there is no plausible way of reading those words to exclude Indian tribes.  And, as I will next explain, I do not see how we could be convinced of that, once we consider that phrase in the context in which it appears.  See Abramski v. United States, 573 U.S. 169,

179 (2014) ("[W]e must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context.").

Notably, the majority's reading necessarily makes the phrase "or other foreign or domestic government" a catch-all for every species of "government," near or far, that can be found anywhere on Earth. Yet, if the majority is right that Congress had that sweeping intention, then it is curious to me that Congress chose to express that intent in the way that it did. After all, Congress easily could have used the simpler and seemingly self-evidently all-encompassing phrase "any" -- or, even better "every" -- "government" to be the sole means of defining a "governmental unit." Cf. Parden v. Terminal Ry. of Ala. State Docks Dep't, 377 U.S. 184, 187-88 (1964), overruled on other grounds by Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666 (1999) (describing a statute that concerned "every common carrier" as utilizing "all-embracing language" (emphasis added)). And, had Congress done so, this dissent would not need to have been written -- nor, I would hazard, would this appeal even have been taken.

But, instead, Congress chose to define that term "governmental unit" much more cumbersomely, by using "general words [that] follow specific words in a statutory enumeration." Cir. City Stores, Inc. v. Adams, 532 U.S. 105, 114-15 (2001) (emphasis added) (quoting 2A N. Singer, Sutherland on Statutes and

Statutory Construction § 47.17 (1991)).[16] And, that leads me to pause before signing on to the majority's Indian tribe-inclusive reading as the only plausible one, because when Congress describes a general class after first setting forth a more specific exemplary list -- as Congress did in § 101(27) -- there is often good reason to think that Congress included the list to make the general class more selective than the words that describe that class might otherwise suggest.

For example, the Supreme Court construed a provision in the Federal Arbitration Act ("FAA") that excludes from its coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, not to include all "workers" that Congress could have reached through the exercise of its commerce power. See Cir. City Stores, Inc., 532 U.S. at 109, 114-15. The Court did so,

_____

[16] To be sure, § 101(27) does define a term that, in turn, is relied on to define the scope of an abrogation of sovereign immunity that a different provision of the Code effects. But, I do not see how we could conclude that it is clear and unequivocal that Congress included the specific list here due to a special concern about the need to use "magic words," see FAA v. Cooper, 566 U.S. 284, 291 (2012), such that Congress must be understood to have included the list solely to address that concern and not to illustrate the type of relationship to the United States that Congress had in mind in defining the class to be not "any" or "every government" but only "or other foreign or domestic government." For, if that abrogation-based concern were the sole reason for Congress's decision to include the list, then why did Congress bother to list expressly a species of government that does not possess sovereign immunity, "municipality", see Owen, 445 U.S. at 645-46 -- while not listing one that does, Indian tribe?

moreover, not only because it thought that the words "engaged in interstate commerce" themselves were less than encompassing of the full reach of Congress's commerce power over workers, id. at 118-19, but also because the construction of those "general words" to encompass that reach would "fail[] to give independent effect to the statute's enumeration of the specific categories . . . which precedes it," id. at 114.

The Court explained in that regard that "there would be no need for Congress to use the phrases 'seamen' and 'railroad employees' if those same classes of workers were subsumed within the meaning of . . . the residual clause." Id. at 114; see also Loughrin v. United States, 573 U.S. 351, 358 (2014) (describing the "'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute'" (quoting Williams v. Taylor, 529 U.S. 362, 404 (2000))). Thus, the Court concluded that -- at least absent a good reason to conclude otherwise -- the "general words" there were better construed to refer only to those "workers" that shared characteristics that made them "similar in nature" to the two specific categories of workers expressly listed. Cir. City Stores, Inc., 532 U.S. at 114-15. And so, the Court held, in part for that reason, that the class of "other workers engaged in interstate commerce" included only "transportation workers" -- like seamen and railroad workers -- and so not workers at commercial stores,

as they are not engaged in interstate commerce in that "transportation"-related way.  Id. at 109.

With that precedent in mind, I note that -- aside from "foreign state[s]" -- the listed types of "government" in § 101(27) share a characteristic beyond the fact that each of them operates within the United States, insofar as that entity is understood to be merely a geographic location on Earth.  That shared characteristic is that each of them is also an institutional component of the United States, insofar as that entity is understood not just as a physical location on a map but as a governmental system that traces its origin to the United States Constitution.

For that reason, it is plausible to me that Congress, by using the words "domestic" and "foreign" to describe the general class that follows the exemplary list, did not mean to include within the definition of a "governmental unit" every "government" on Earth, near or far.  Instead, it is plausible to me that Congress meant by using those terms only to include a "government" that can trace its origins either to our federal constitutional system of government (such that it is a "domestic government") or to that of some "foreign state" (such that it is a "foreign government"). See domestic, Black's Law Dictionary (5th ed. 1979) (defining "domestic" as "pertaining, belonging or relating to . . . the place of birth, origin, creation, or transaction"); domestic,

Black's Law Dictionary (4th ed. 1968) (same); cf. Dep't of Lab. v. Greenwich Collieries, 512 U.S. 267, 272, 275 (1994) (finding that the "ordinary or natural meaning" of a statutory phrase was "the meaning generally accepted in the legal community at the time of enactment"); see also domestic, Webster's Third New International Dictionary 671 (1961) (defining "domestic" to mean "belong[ing] or occur[ring] within the sphere of authority or control").

Indeed, in my view, such a reading of § 101(27) draws support from the fact that it would explain -- as the majority's reading would not -- why Congress set forth a comprehensive and detailed list of "government[s]," both "domestic" and "foreign," without also including Indian tribes on it. For, if Congress were trying to encompass not all governments on Earth but only all the components of the constitutional system of government that is the United States and all those that are the components of the system of government of "foreign state[s]," then there would be no reason to include Indian tribes on that list. And that is so, because, unlike the listed governmental types, Indian tribes neither ratified the Constitution nor trace their origins to it. Nor do they trace their origins to any "foreign" system of government in the way that a "foreign state" does. Cf. Blatchford v. Native Vill. of Noatak & Circle Vill., 501 U.S. 775, 782 (1991) (explaining that while tribes are in a geographical-presence-sense "domestic," "[t]he relevant difference between [tribes and other]

sovereigns . . . is not domesticity [in that presence-based sense], but the role of each in the [Constitutional] convention"); Bay Mills Indian Cmty., 572 U.S. at 789-90 (noting that "it would be absurd to suggest that the tribes -- at a conference to which they were not even parties -- similarly ceded their immunity").

In positing that it is plausible that Congress had such an intention in formulating this Code provision, I am hardly ascribing to Congress an understanding of Indian tribes that is novel. In fact, as the Lac du Flambeau Band of Lake Superior Chippewa Indians here points out, Indian tribes have long been understood to be sui generis precisely because they uniquely possess attributes characteristic of "nations" without themselves being "foreign state[s]." Bay Mills Indian Cmty., 572 U.S. at 805-06 (Sotomayor, J., concurring) (explaining that "[t]wo centuries of jurisprudence . . . weigh against treating Tribes like foreign visitors in American courts"); Cherokee Nation v. Georgia, 30 U.S. 1, 13 (1831) (referring early on to Indian tribes as "domestic dependent nations" (emphasis added)). In fact, in accord with the understanding that Indian tribes are "marked by peculiar and cardinal distinctions which exist nowhere else," Cherokee Nation, 30 U.S. at 16, the Court itself has continued to emphasize that U.S. government "relations with the Indian tribes have 'always been . . . anomalous . . . and of a complex character,'" given that "the tribes remain quasi-sovereign nations

which, by government structure, culture, and source of sovereignty are in many ways foreign to the constitutional institutions of the federal and state governments." Santa Clara Pueblo, 436 U.S. at 71 (emphasis added) (quoting United States v. Kagama, 118 U.S. at 381); see also, Joshua Santangelo, Bankrupting Tribes: An Examination of Tribal Sovereign Immunity as Reparation in the Context of Section 106(a), 37 Emory Bankr. Dev. J. 325, 354 (noting the various dimensions in which tribes differ from states). In this salient respect, then, Indian tribes are not "similar in nature" either to any "domestic government" that is listed in § 101(27) or to any "foreign state," as that provision uses that term.

This narrower reading of "or other foreign or domestic government" also would not empty that phrase of all content. The phrase still would usefully pick up commissions and authorities created by interstate compacts and their "foreign" counterparts, as no other words in § 101(27) encompass any of them, and they are, as a group, sufficiently difficult to categorize pithily that it would be natural to encompass them through a residual clause of the sort that follows an express list. For, as creatures of listed "domestic government[s]," interstate hybrids do trace their origins to the governmental system of the United States and not (like Indian tribes) to a source of sovereignty that predates it.

In an attempt to show that this reading of the text is implausible, the majority asserts that the word "domestic" cannot connote "origin" unless it is being used to describe a product. See Maj. Op. at 18.  But, the dictionary that the majority cites in support of that proposition says no such thing, see domestic, Oxford English Dictionary Online (Mar. 2022 update), and that definition is not from the time § 101(27) was enacted, see Tanzin v. Tanvir, 141 S. Ct. 486, 491 (2020) (instructing courts to "turn to the phrase's plain meaning at the time of enactment" when trying to construe a statute's meaning).  Moreover, both of the definitions to which the majority points suggest that the word "domestic" describes a relationship that is not merely territorial.  See Maj. Op. at 18 (contrasting the Oxford English Dictionary's definition of "domestic" as "Indigenous; made at home or in the country itself; native, home-grown, home-made," with its alternative definition that the word means "[o]f or relating to one's own country or nation; not foreign, internal, inland, 'home'").  Rather, those definitions, like the legal definition cited to above, suggest that a government is "domestic" to a thing if it has its origins in that thing.  Compare domestic, Oxford English Dictionary Online (Mar. 2022 update), with domestic, Black's Law Dictionary (11th ed. 2019) (defining "domestic" as a legal term to mean "[o]f, relating to, or involving one's own country").  And, of course, an origins-based definition -- because

it need not be addressing a merely territorial tie -- could suggest that all governments that have their "origins" in the United States constitutional system would be "domestic" to the United States and thus that, as the Band argues, an Indian tribe is not encompassed by the definition because it is a nation in and of itself that does not have its origins in the federal Constitution.[17]

[17] The majority suggests that this reasoning could support a reading of "domestic government" that would "refer to household management." See Maj. Op. at 20. But, I do not see how that is so, given that "other . . . domestic government" is a "general term[] [that] follow[s] specific [terms]" such that the "general term" is "limited . . . to matters similar to those specified." Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 163 n.19 (2012). In other words, while I suppose the words "any other class of workers engaged in . . . interstate commerce" could be referring in some contexts to constitutional scholars of the Commerce Clause, that observation in no way undermines a reading of those words that would take them to be referring to transportation workers in the specific context of 9 U.S.C. § 1. And, that is precisely because those words follow the specific list of classes of workers set forth in the provision. See Cir. City Stores, Inc., 532 U.S. at 114-15. Thus, my suggestion that the words "domestic government" in § 101(27) of the Code plausibly may be read in context to be referring only to those governmental entities that (unlike Indian tribes) are components of our constitutional system of government is not undermined by the majority's observation that in some contexts those words also could mean "household management." For, the statutory context here plainly rules out that reading of them while it plausibly rules in the one that I posit. Nor, I note, does the majority at any point explain why that is not so, as it does not dispute either that each of the expressly listed governmental entities in § 101(27) that is not "foreign" traces its origins to the U.S. Constitution in a way that no Indian tribe does, or that it is good interpretive practice to construe a general term that follows an express list in light of the special characteristics that are shared by the items on that list.

For these reasons, therefore, I do not see how the textual case can be made that the words "domestic government" must be read to include Indian tribes.  Nor is there any need to take my word for it, because the notion that a "tribal government" is plausibly understood to be neither a "domestic" nor a "foreign government" is not a figment of my imagination.  One need only consult the Code of Federal Regulations to see that same understanding laid out in official black and white.  <u>See</u> 7 C.F.R § 205.2 (defining "Governmental entity" as: "domestic government, tribal government, or foreign governmental subdivision . . . .").

Perhaps for this reason the majority offers what are -- in essence -- non-textual reasons to read the text to be clearer than it is.  For example, the majority suggests that my reading "proposes a radical new rule of construction," <u>see</u> Maj. Op. at 17-18, and so must be rejected on grounds of novelty even if it is otherwise plausible.  But, in fact, the reading I am positing relies on many of the same dictionary definitions that the majority utilizes as well as traditional canons of statutory interpretation, none of which are new or applied in novel ways.

Certainly, the majority would not suggest that <u>Circuit City Stores</u> endorsed a radical new rule of construction that all entities on a list must be understood to have a transportation tie.  It merely applied the established interpretive principle that when expressly listed entities share a salient

characteristic, it makes sense to construe the general residual phrase that follows to include only other entities that, though not expressly listed, share that characteristic. I am doing nothing different in focusing on the way in which the listed entities in § 101(27) are like each other and then drawing on that similarity to construe the residual phrase that provision contains.

The majority also contends that the reading I am proposing must be rejected because it was "never briefed by the parties," see Maj. Op. at 18, and so must be deemed waived even if it otherwise holds up. But, in fact, the Band argued, citing Circuit City Stores, that a "word is known by the company it keeps," such that the residual phrase does not encompass "every single government that exists" but rather just those "governments similar to the federal government, states, and foreign governments." And, the Band argued, "Indian tribes are 'not a foreign state' nor 'a domestic state,' but rather are 'marked by peculiar and cardinal distinctions which exist nowhere else.'" (quoting Cherokee Nation, 30 U.S. at 16). Thus, the arguments that I am making are not materially different from those that the Band advances.

The majority's final suggestion is that the reading of § 101(27) that I am positing is out of bounds because it depends on there being a "magic words" requirement for the abrogation of

an Indian tribe's immunity from suit under the Code.  See Maj. Op. at 19-20.  But, I do not see how that is so.[18]

In noting that the text at issue could be read to exclude Indian tribes, I am not thereby "requir[ing]" Congress to use the phrase "every government," as the majority contends.  Rather, Congress is free to use any number of different phrases to indicate unambiguously its intent to abrogate an Indian tribe's immunity -- "every government," "any government with sovereign immunity," or "Indian tribes."  There are no doubt others.

Congress cannot, however, abrogate tribal immunity with the requisite degree of clarity by setting forth a specifically enumerated list of governments in which each is unlike an Indian tribe in the same way and then including a general phrase thereafter that itself can plausibly be read to encompass only the

---

[18] When the Court articulated its disavowal of a "magic words" test for abrogating sovereign immunity in FAA v. Cooper, 566 U.S. 284 (2012), it was confronted only with a question about whether Congress intended to abrogate the United States's immunity from suit and not whether it intended for the abrogation of immunity it intended to effect for some governments to apply to the United States.  See id. at 291.  Nor is Cooper unusual in that respect. To my knowledge, the Court has never resolved a case concerning abrogation of sovereign immunity that concerned the governments to which the abrogation applied rather than whether abrogation was intended for any government at all.  But, even though the Court has not spoken as to whether the "magic words" rule from Cooper would apply when resolving an abrogation question like the one before us, the Court has also given no indication that the "magic words" rule would not apply in such a case.  And so, I proceed on the assumption that the bar to a "magic words" requirement does apply.

- 47 -

kinds of governments that share the characteristic of the listed entities -- a characteristic that Indian tribes lack. And, that is because even if Congress need not use magic words to make clear that its abrogation provision applies to Indian tribes, it must at least use words that clearly and unequivocally refer to Indian tribes if it wishes to make that abrogation provision apply to them.

**IV.**

I acknowledge that, despite all these textual reasons to doubt that § 101(27) encompasses Indian tribes, it is not obvious that Congress would have wanted to abrogate the immunity of every sovereign entitled to assert it but an Indian tribe. I also recognize that a sovereign's retention of immunity under the Code interferes with the Code's operation. But, insofar as the majority means to suggest that we need not be guided by considerations of statutory text alone, the evidence of legislative purpose also is not as clearly and unequivocally on the side of reading § 101(27) to include Indian tribes as the majority suggests.

The retention of immunity by Indian tribes would not render the Code unworkable. The immunity would supply no defense with respect to provisions of the Code (such as the one that permits a bankruptcy court to order the discharge of debts) that do not authorize in personam suits against Indian tribes. See Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 450

(2004) ("A debtor does not seek monetary damages or any affirmative relief from a State by seeking to discharge a debt; nor does he subject an unwilling State to a coercive judicial process. . . . We find no authority [to] . . . suggest[] [that] a bankruptcy court's exercise of its in rem jurisdiction to discharge a . . . debt would infringe state sovereignty."); id. at 448 ("States, whether or not they choose to participate in the proceeding, are bound by a bankruptcy court's discharge order no less than other creditors."). Nor would an Indian tribe retain immunity with respect to its filing of a proof of claim to collect debts it is owed by an individual in bankruptcy proceedings. Cf. C & L Enterprises, Inc., 532 U.S. at 418; Gardner v. New Jersey, 329 U.S. 565, 573-74 (1947) ("It is traditional bankruptcy law that he who . . . offer[s] a proof of claim . . . must abide the consequences of that procedure. If the claimant is a State, the procedure of [filing a proof of claim] . . . is not transmitted into a suit against the State because the court entertains objections to the claim." (citation omitted)); In re White, 139 F.3d 1268 (9th Cir. 1998) (applying Gardner to an Indian tribe's participation in a bankruptcy proceeding notwithstanding its assertion of tribal immunity); cf. also In re Nat'l Cattle Cong., 247 B.R. 259, 268-69 (Bankr. N.D. Iowa 2000) (same).

The Code also would still apply to Indian tribes, notwithstanding their retention of immunity. See Kiowa Tribe of

Okla., 523 U.S. at 755 (explaining that "[t]here is a difference between the right to demand compliance with [the] law[] and the means available to enforce [it]"); In re Greektown Holdings, 917 F.3d at 461–62 (applying that principle to the Code). Thus, if an Indian tribe were to try to sue to collect a debt in federal court while the debtor was in bankruptcy proceedings under the Code, the automatic stay still would appear to require the proceeding to be dismissed, while equitable relief could also provide an avenue for a debtor to enforce certain provisions of the Code against tribal actors. Bay Mills Indian Cmty., 572 U.S. at 796 (emphasis omitted).

To be sure, the Code does afford benefits to "governmental units" that Indian tribes would be denied if § 101(27) were construed to leave them out. See, e.g., 11 U.S.C. § 523(a) (preventing certain types of debts owed to "governmental units," such as taxes and restitution orders, from being discharged via bankruptcy); id. § 362(b) (permitting "governmental unit[s]" to engage in certain functions despite the automatic stay). But, at the same time, that construction would have the potentially salutary consequence of preserving the potential for tribal businesses to take advantage of the Code's protections for debtors -- a benefit that itself may be no small thing for Indian tribes. See id. § 109 (permitting "person[s]" to file for bankruptcy under Chapters 7 and 11 of the Code); id. § 101(41) (defining "person"

to include an "individual, partnership, and corporation, but does not include [a] governmental unit"); Memphis Biofuels, LLC v. Chickasaw Nation Indus., 585 F.3d 917, 921 (6th Cir. 2009) (finding that a tribal business incorporated under § 17 of the Indian Reorganization Act, 25 U.S.C. § 477, was immune from suit as an arm of the tribe); see also Laura N. Coordes, Beyond the Bankruptcy Code: A New Statutory Bankruptcy Regime for Tribal Debtors, 35 Emory Bankr. Dev. J. 363, 377-78 (2019) (explaining that tribal corporations may be able to file for bankruptcy under Chapters 7 or 11 under the Code); R. Spencer Clift III, The Historical Development of American Indian Tribes; Their Recent Dramatic Commercial Advancement; and a Discussion of the Eligibility of Indian Tribes Under the Bankruptcy Code and Related Matters, 27 Am. Indian L. Rev. 177, 224-33 (2007) (same); cf. Bay Mills Indian Cmty., 572 U.S. at 810 (Sotomayor, J., concurring) (noting that Tribe-owned "enterprises in some cases 'may be the only means by which a tribe can raise revenues,' . . . due in large part to the insuperable . . . barriers Tribes face in raising revenue through more traditional means" (citation omitted)); Okla. Tax Comm'n, 498 U.S. at 510 (emphasizing Congress's long-standing, "'overriding goal' of encouraging tribal self-sufficiency and economic development" (quoting California v. Cabazon Band of Mission Indians, 480 U.S. 202, 216 (1987))).

Thus, in addition to the textual reasons not to leap too quickly to the conclusion that Congress defined "governmental unit" to include Indian tribes, there are reasons rooted in attention to legislative purpose for not doing so as well. Cf. Santa Clara Pueblo, 436 U.S. at 64 ("Where Congress seeks to promote dual objectives in a single statute, courts must be more than usually hesitant to infer from its silence a cause of action that, while serving one legislative purpose, will disserve the other."). Indeed, insofar as legislative purpose is our concern, it is worth recalling that federal bankruptcy law prior to the Code's enactment in 1978 seemingly permitted tribal corporations to file for bankruptcy, even though states and municipalities could not. See Bankruptcy Act Amendments of 1938 ("Chandler Act"), ch. 575, §§ 1(24), 1(29), 4, 52 Stat. 840, 841-42, 845 (1938). It is worth recalling, too, that federal bankruptcy law at that time also did not treat Indian tribes as governments entitled to priority status for their taxes, even though the United States, states, the District of Columbia, territories, or their instrumentalities all were. See id. at §§ 1(29), 64(4), 52 Stat. at 842, 874.

It is therefore at least somewhat puzzling -- if Congress did intend for § 101(27) to include Indian tribes -- that the legislative history to the Code does not suggest that it is making

any shift in their treatment.  In fact, that legislative history makes no relevant mention of Indian tribes at all.[19]

I do not mean to suggest by negative implication, though, that we may rely on surmise about congressional purpose to find an abrogation of a sovereign's immunity to be clear and unequivocal when the relevant legislative text does not otherwise require us

---

[19] None of the majority's examples in which the term "Indian" or "domestic dependent nation" was used in the congressional debate that occurred while the Code was being considered refer to the treatment of Indian tribes under the Code.  See, e.g., 123 Cong. Rec. 35447 (Oct. 27, 1977) (statement of Rep. Cohen) (discussing a complicated criminal case in Maine known as the "Indian litigation" that demonstrated that district courts lacked the capacity to manage bankruptcy litigation); 139 Cong. Rec. H8609-03, H8612 (Oct. 28, 1993) (statement of Rep. Thomas) (using the term during debate of the Lumbee Recognition Act); 124 Cong. Rec. 8380 (Apr. 3, 1978) (statement of Sen. Hatch) (using the term to discuss the status of Indian tribes in the Constitution in the context of discussing a proposed treaty regarding the Panama Canal).

Moreover, the one Bankruptcy Court case that the majority relies on to support the proposition that Congress understood an Indian tribe to be a "domestic government" under § 101(27) at the time of the 1994 amendments to § 106 and thus to have ratified that view by amending § 106, In re Bohm's Inc., No. B-77-1142 PHX VM, 1979 Bankr. LEXIS 895 (Bankr. D. Ariz. 1979), does not do so. It treated the claim the San Carlos Apache Tribe filed to recoup hunting and fishing fees owed to it as being effectively a claim by a federal instrumentality, id. at *2, by reasoning that because the Tribe was using powers delegated to it by the federal government, it was as if the federal government itself was acting when the Tribe levied those fees, id. at *9-10.

And, while I am aware of a pair of Bankruptcy Court cases that do treat tribes as suable without their consent under the Code, see In re Sandmar Corp., 12 B.R. 910 (Bankr. D.N.M. 1981); In re Shape, 25 B.R. 356 (Bankr. D. Mont. 1982), each was decided after the enactment of § 101(27) and neither analyzes it in other than conclusory fashion.

to so conclude. In construing the pre-1994 version of § 106 in Hoffman v. Connecticut Department of Income Maintenance, 492 U.S. 96 (1989), the Court made clear that we may not do so, as it explained there that "attempts . . . to construe § 106 in light of the policies underlying the Bankruptcy Code are . . . not helpful in determining whether the command [that sovereign immunity be abrogated only clearly and unequivocally] is satisfied," id. at 104; see also Nordic Village, Inc., 503 U.S. at 33 (expressly relying on the reasoning in Hoffman's plurality opinion). Rather, the Court emphasized, "congressional intent is unmistakably clear in the language of the statute . . . [or] it is not, [such that the clear and unequivocal standard] [is] not . . . satisfied." Hoffman, 492 U.S. at 104.

It follows, in my view, that we have no choice but to conclude that § 101(27) does not clearly and unequivocally include Indian tribes, because, as I have explained, its text plausibly may be read not to cover them. I note that, in accord with that conclusion, the Court recently listed examples in which Congress had cut back on tribal immunity in the commercial realm and, in doing so, did not mention the Code, even though the Code would seem to be the example par excellence of such an abrogation -- insofar as the Court had understood it to have brought one about. See Kiowa Tribe of Okla., 523 U.S. at 758-59.

**V.**

"The special brand of sovereignty the tribes retain -- both its nature and its extent -- rests in the hands of Congress." Bay Mills Indian Cmty., 572 U.S. at 800. That means that "it is fundamentally [Congress's] job, not ours, to determine whether or how to limit tribal immunity." Id. Therefore, if my construction of "governmental unit" is as antithetical to the purposes of the Code as the majority contends, Congress must amend it, just as Congress did after Hoffman. See also Bay Mills Indian Cmty., 572 U.S. at 794 (cautioning that courts "do[] not revise legislation . . . just because the text as written creates an apparent anomaly" -- even in the context of anomalies arising from a failure to abrogate tribal sovereign immunity).

That is not to say that it is costless for Congress to have to do so. But, I do not see how we can spare Congress that expense here. We are not permitted to anticipate that Congress intends to abrogate tribal immunity any more than we are permitted to anticipate that Congress intends to abrogate the immunity of other sovereigns, whether a State or the United States. And, in contrast to the clarity with which Congress plainly abrogated a "core aspect of [the] sovereignty" of the United States and each of the fifty states in § 101(27), it failed to make clear in that same provision that it has given the kind of thoughtful attention to the sovereignty of Indian tribes that it must before abrogating

their sovereign immunity from suit.  Because I see no reason to permit Congress to abrogate an Indian tribe's sovereign immunity in terms less clear than it must use to abrogate the immunity of other sovereigns that are more likely to find their interests accounted for by that legislative body, I respectfully dissent.